213 F.3d 454 (9th Cir. 2000)
 In re MEGO FINANCIAL CORPORATION SECURITIES LITIGATION
Christopher Dunleavy; A. Peyser, Plaintiffs-Appellees,
v
Michael NADLER, Plaintiff-Appellant,
v.
Robert Nederlander; Jerome J. Cohen; Herbert B. Hirsch; Wilbur L. Ross, Jr.; Deloitte & Touche, Defendants-Appellees.
 No. 99-15361
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted February 17, 2000
Filed May 22, 2000
As Amended June 19, 2000.
 
 [Copyrighted Material Omitted]
 Mark E. King, David B. Kahn & Associates, Northfield, Illinois, for the plaintiff-appellant.
 Patricia I. Avery, Wolf, Popper, Ross, Wolf & Jones, New York, New York, for plaintiffs-appellees Dunleavy and Peyser.
 Andrew C. Houston, Wachtell, Lipton, Rosen & Katz, New York, New York, for defendants-appellees Nederlander, Ross, Hirsch, and Cohen.
 Donn P. Pickett, McCutchen, Doyle, Brown & Enersen, San Francisco, California, for defendant-appellee Deloitte & Touche.
 Appeal from the United States District Court for the District of Nevada
 Before: Joseph T. Sneed, Mary M. Schroeder, and A. Wallace Tashima, Circuit Judges.
 SNEED, Circuit Judge:
 
 
 1
 Appellant Michael Nadler challenges the district court's approval of a $1.725 million (plus accrued interest) settlement agreement (the "Settlement") and plan of allocating the Settlement (the "Plan of Distribution") in a securities class action litigation. This litigation was brought on behalf of investors who purchased Mego common stock from January 14, 1994 through and including November 9, 1995 (the "Class Period") against Mego Financial Corp. ("Mego"), Deloitte & Touche, LLP ("Deloitte"), and a number of individuals[1] (collectively, Mego, Deloitte & individual defendants are referred to as "Defendants").
 
 
 2
 Nadler argues that the district court abused its discretion by: (1) approving the Settlement; (2) approving the Plan of Distribution; (3) certifying the class for Settlement; (4) awarding a substantial fee award to counsel for plaintiffs ("Class Counsel"); and (5) awarding an additional incentive award to the representatives of the class.
 
 
 3
 We have jurisdiction pursuant to 28 U.S.C. S 1291 and we affirm.
 
 
 4
 * Defendant Mego is a financial services company that specializes in financing timeshare land sales and Title I home improvement loans insured by HUD. The individual defendants were officers and/or directors of Mego. Deloitte was Mego's independent auditor prior to and during the Class Period.
 
 
 5
 On November 10, 1995, before the opening of the market, Mego, with Deloitte's concurrence, issued a press release stating, inter alia, that it would be making certain adjustments to previously issued financial statements and that further review would likely result in additional material adjustments. Mego's stock immediately fell from $9.25 and closed that day at $6.125 (a 34% decline). The price of the stock slightly rebounded the next day and shortly thereafter traded in the $78 range. In March 1996, Mego disclosed the full details of the restatement of its financial condition. The final disclosure did not cause a negative reaction in the price of Mego stock and in fact the share price actually increased soon thereafter.
 
 
 6
 Almost immediately after the initial press release, Dunleavy and Peyser (collectively, "Class Representatives" or "Plaintiffs") filed separate actions based on the overstatement of Mego's earnings and the trading by one of the individual defendants. These complaints asserted claims against the Defendants for violations of SS 10(b) and 20(a) of the Securities and Exchange Act of 1934, Rule 10b-5, and certain supplemental state law claims. In June 1996, the district court consolidated the Plaintiffs' actions, appointed lead counsel for the litigation, and directed that discovery be conducted through them.
 
 
 7
 In July 1996, Nadler filed a motion to intervene in the litigation as a putative class representative. In December 1996, Nadler filed a class action complaint asserting substantially the same claims as the Plaintiffs' previously consolidated actions. In March 1997, the district court denied without prejudice Nadler's motion to intervene pending the outcome of settlement negotiations between the lead counsel and Defendants. In May 1997, the Plaintiffs and Defendants in the consolidated actions entered into a memorandum of understanding ("MOU") setting forth an agreement-inprinciple to settle the litigation.
 
 
 8
 The MOU provided for a fund in the amount of $1.725 million plus accrued interest to be distributed as follows: (1) the cost of administering and distributing the fund to the class, (2) up to 33 1/3 % to pay Plaintiff's counsel's contingency fees, (3) a $5,000 incentive award to each Plaintiff, (4) reasonable costs incurred in preparation of tax returns, and (5) the remainder to the class pursuant to the Plan of Distribution. On June 10, 1998, the district court certified the class for settlement and preliminarily approved the Settlement and Plan of Distribution.
 
 
 9
 Subsequently, over 5,400 notices were mailed to potential members of the class advising them of the litigation and the terms of the proposed Settlement and Plan of Distribution. The notice also advised class members that they could remain a member of the class, opt-out of the class, or object to the proposed settlement at a settlement hearing before the court.
 
 
 10
 Nadler chose not to opt-out but filed objections to the proposed Settlement and Plan of Distribution in August 1998. Only one member of the proposed class chose to opt-out while a handful chose to join Nadler in objecting to the proposed Settlement and Plan of Distribution. The objectors were heard during a fairness hearing in September 1998. In October 1998, the district court, notwithstanding the objections, approved the Settlement and Plan of Distribution as proposed. Nadler then brought this timely appeal.
 
 
 11
 It is basic to an understanding of this proceeding to observe that Plaintiffs filed their actions in November 1995, before the effective date of the Private Securities Litigation Reform Act of 1995 ("PSLRA"). There were no other actions filed before the effective date of the PSLRA. Nadler filed his action in December, 1996, after the effective date of the PSLRA.
 
 II
 
 12
 We hold that the district court did not abuse its discretion in (1) finding that the Settlement amount of $1.725 million was fair, adequate and reasonable given the difficulties in proving the case; (2) approving the Plan of Distribution's methodology for allocating the Settlement given that it was similar to the methodology Congress has endorsed; and (3) certifying the class for Settlement. We discuss each in turn.
 
 A. THE SETTLEMENT
 1. Standard of Review
 
 13
 Review of the district court's decision to approve a class action settlement is extremely limited. See Linney v. Cellular Alaska Partnership, 151 F.3d 1234, 1238 (9th Cir. 1998); Class Plaintiffs v. City of Seattle, 955 F.2d 1268, 1276 (9th Cir. 1992). The district court's "decision to approve or reject a settlement is committed to the sound discretion of the trial judge because he is exposed to the litigants, and their strategies, positions, and proof." Hanlon v. Chrysler Corp., 150 F.3d 1011, 1026 (9th Cir. 1998) (internal quotations and citations omitted). Thus, we will affirm if the district court judge applies the proper legal standard and his findings of fact are not clearly erroneous. See In re Pacific Enter. Sec. Litig., 47 F.3d 373, 377 (9th Cir. 1995).
 
 2. Discussion
 
 14
 Federal Rule of Civil Procedure 23(e) provides that:
 
 
 15
 A class action shall not be dismissed or compro mised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in a manner as the court directs.
 
 
 16
 Rule 23(e) has been interpreted to require the district court to determine whether a proposed settlement is fundamentally fair, adequate, and reasonable. See Hanlon, 150 F.3d at 1026 (citations omitted). Settlements that take place prior to formal class certification require a higher standard of fairness. See id.
 
 
 17
 "Assessing a settlement proposal requires a district court to balance a number of factors: the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining a class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; . . . and the reaction of the class members to the proposed settlement." Hanlon, 150 F.3d at 1026 (citations omitted). The district court must show that it has explored these factors comprehensively to survive appellate review. See Hanlon , 150 F.3d at 1026; Linney, 141 F.3d at 1242. In addition, the settlement may not be the product of collusion among the negotiating parties. Class Plaintiffs, 955 F.2d at 1290.
 
 
 18
 In this case, the district court held a hearing in which it preliminarily approved the Settlement and Plan of Distribution. Thereafter, following class-wide notice, the district court held a fairness hearing in which Nadler raised all of the issues that he now raises on appeal. The district court properly addressed the relevant issues during the fairness hearing and in the court's final order approving the Settlement and Plan of Distribution.
 
 
 19
 a. The Strength of the Plaintiffs' Case and the Risk, Expense, Complexity, and Likely Duration of Further Litigation
 
 
 20
 The district court properly found that the Plaintiffs' case was weak and the risk, expense, and complexity of trial weighed against them. Specifically, it found:
 
 
 21
 The heart of plaintiff's case is that defendants profited by artificially inflating the price of Mego stock. However, none of the insider defendants sold any of their shares of Mego stock, or profited from the alleged inflation during the relevant period. While one of the outside defendants is alleged to have sold 1.7 percent of his Mego holdings, that single transac tion alone is insufficient to support an inference of massive fraud.
 
 
 22
 E.R. 651.
 
 
 23
 b. The Amount Offered in Settlement
 
 
 24
 The district court considered the amount offered in settlement a reasonable amount in light of the uncertainties of trial and difficulties in proving scienter. There were various estimates of the maximum amount of damages recoverable in a successful litigation. Nadler's counsel estimated a total loss to the class upwards of $12 million and the Plaintiffs' independent expert estimated a total loss to the class of $4.1 million. The district court concluded that Nadler's estimate was unreliable because his counsel stood to significantly benefit from the court's rejection of the proposed settlement. Furthermore, the district court found that Nadler's counsel failed to take into account market fluctuations, possible variations in the dimensions of the class, the volatility of stock and the substantial rebound in Mego stock after its initial decline. Finally, the district court found that Plaintiffs' independent expert exercised somewhat greater independence and employed a more sound methodology that Nadler was unable substantially to impeach.
 
 
 25
 "It is well-settled law that a cash settlement amounting to only a fraction of the potential recovery does not per se render the settlement inadequate or unfair." Officers for Justice v. Civil Serv. Comm'n, 688 F.2d 615, 628 (9th Cir. 1982). Even assuming that Nadler's methodology was more sound, the Settlement amount of almost $2 million was roughly onesixth of the potential recovery, which, given the difficulties in proving the case, is fair and adequate.
 
 
 26
 c. The Extent of Discovery Completed and the Stage of the Proceedings
 
 
 27
 It is true that extensive formal discovery had not been completed. However, "[i]n the context of class action settlements, `formal discovery is not a necessary ticket to the bargaining table' where the parties have sufficient information to make an informed decision about settlement." Linney, 151 F.3d at 1239 (citing In re Chicken Antitrust Litig., 669 F.2d 228, 241 (5th Cir. 1982)). The district court noted that Class Counsel conducted significant investigation, discovery and research, and presented the court with documentation supporting those services. The district court further noted that Class Counsel had worked with damages and accounting experts throughout the litigation. The district court's conclusion that the Plaintiffs had sufficient information to make an informed decision about the Settlement is not clearly erroneous.
 
 
 28
 d. The Experience and Views of Counsel
 
 
 29
 The district court did not discuss whether counsel for Plaintiffs were experienced and competent; however, the record confirms that they were and no one asserts otherwise.
 
 
 30
 e. The Reaction of the Class Members to the Proposed Settlement
 
 
 31
 The reaction of the class members to the proposed settlement further supports the conclusion that the district court did not abuse its discretion in finding that the Settlement was fair, adequate and reasonable. Only one of the 5,400 potential class members to whom notice of the proposed Settlement and Plan of Distribution was sent chose to opt-out of the class and Nadler represented only a handful of objectors at the fairness hearing.
 
 
 32
 f. Collusion Between the Parties
 
 
 33
 Finally, the district court found that there was no collusion between the Class Counsel and Defendants. While Nadler asserts that there was serious circumstantial evidence of collusion indicated by the parties' vigorous opposition to his entry into the litigation, the district court found that the Plaintiffs had valid reasons for opposing his involvement. Specifically, Nadler did not file his action until after the effective date of the PSLRA and he arguably would have placed the class on a different statutory footing. Further, the district court noted that both the Plaintiffs and Defendants filed declarations stating that their dealings had been conducted on an adversarial, arms-length basis, and Nadler's suspicions were unfounded. The district court's conclusions are not clearly erroneous.
 
 
 34
 g. Conclusion
 
 
 35
 The district court applied the proper legal standard in assessing the relevant factors and its findings of fact were not clearly erroneous. Therefore, we find that the district court did not err in approving the Settlement.
 
 B. THE PLAN OF DISTRIBUTION
 1. Standard of Review
 
 36
 The district court's approval of an allocation plan for a settlement in a class action is reviewed for an abuse of discretion. In re Equity Funding Corp. of America Sec. Litig., 603 F.2d 1353, 1362 (9th Cir. 1979).
 
 2. Discussion
 
 37
 The Plan of Distribution allocates the net Settlement according to the rescissory measure of damages. The rescissory measure of damages in theory contemplates a return of the injured party to the position he occupied before he was induced by wrongful conduct to enter the transaction. See Green v. Occidental Petroleum Corp., 541 F.2d 1335, 1342 (9th Cir. 1976) (Sneed, J., concurring). "Assuming a sale and purchase of stock, true rescission would involve a return, on the one hand, of the purchase price and, on the other hand, of the stock purchased." Id. In an open market setting the injured party "returns the stock" by selling it on the open market. The defendant "returns the purchase price" by compensating the injured party for any difference between the price that the injured party paid for the security and its trading price following the disclosure of the fraud. Sometimes the purchase price can be fully recovered on the open market and there is no need for the defendant to compensate for the difference.
 
 
 38
 To illustrate the application of the rescissory measure of damages in an open market setting assume that X purchased 100 shares of ABC stock at $5 per share during a period following a fraudulent misstatement. Further assume that following the disclosure of the fraud the price of ABC stock was $10 per share. X would need only $500 ($5/share x 100 shares) in return for his shares to recover his cost of the 100 shares. Since X could recover $1000 ($10/share x 100 shares) following the disclosure of the fraud simply by selling his shares on the open market no damages are recoverable from ABC.
 
 
 39
 However, were the trading price of ABC stock following the disclosure of the fraud $1 per share then X could only recover $100 ($1/share x 100 shares) by selling his shares on the open market. It follows that to be returned to the status he occupied before the fraudulent transaction X must recover damages in the amount of $400 from ABC -the difference between the purchase price X paid for the ABC stock and the trading price of that security following the disclosure of the fraud.
 
 
 40
 The Plan of Distribution in this case treats the Settlement as a fund to compensate the class members for the difference between the purchase price they paid for the Mego stock and its trading price following the disclosure of the alleged fraud ($6.125 per share). Thus, the Plan of Distribution attempts to return class members to the status they occupied before the fraudulent transaction.
 
 
 41
 Nadler argues that it was an abuse of discretion for the district court to approve of the Plan of Distribution's methodology because it leaves a large portion of the class without a recovery from Mego.[2] We do not agree that the district court abused its discretion in approving the Plan of Distribution even though a portion of the class does not recover damages from Mego. We base our decision on a comparison of the Plan of Distribution's methodology with the method of calculating damages set forth in the recently enacted PSLRA.[3]
 
 
 42
 The PSLRA provides, with exceptions not relevant here, that:
 
 
 43
 [I]n any private action . . . in which the plaintiff seeks to establish damages by reference to the mar ket price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase . . . price paid . . . by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which information correcting the misstate ment or omission that is the basis for the action is disseminated to the market.
 
 
 44
 15 U.S.C. S 78u-4(e) (1994). Section 78u-4(e) essentially caps a plaintiff's damages to those recoverable under the rescissory measure. Thus, if the mean trading price of a security during the 90-day period following the correction is greater than the price at which the plaintiff purchased his stock then that plaintiff would recover nothing under the PSLRA's limitation on damages.
 
 
 45
 The only real difference between the Plan of Distribution's methodology and the PSLRA's is that the Plan of Distribution sets the market recoverable amount based on the date the corrective information was disclosed rather than using the mean trading price during the 90-day period following disclosure. This result is actually more advantageous to the plaintiffs.[4]
 
 
 46
 It is within the discretion of the district court to determine the method of calculating damages. See Blackie v. Barrack, 524 F.2d 891, 909 (9th Cir. 1975), cert. denied, 429 U.S. 816 (1976). The district court did not abuse its discretion in approving of a methodology similar to the one that Congress has mandated in cases filed after the effective date of the PSLRA.
 
 C. CLASS CERTIFICATION
 1. Standard of Review
 
 47
 The district court's decision certifying the class is subject to a "very limited" review and will be reversed "only upon a strong showing that the district court's decision was a clear abuse of discretion." See Linney, 151 F.3d at 1238 (citing Hanlon, 150 F.3d at 1011; Class Plaintiffs , 955 F.2d at 1276 (citing Officers for Justice, 688 F.2d at 626). However, we must bear in mind the Supreme Court's admonition that the certification requirements "designed to protect absentees by blocking unwarranted or overbroad class definitions " demand "undiluted, even heightened, attention in the settlement context." Amchem Prod. v. Windsor, 521 U.S. 591, 620 (1997).
 
 2. Discussion
 
 48
 "Rule 23(a) states four threshold requirements applicable to all class actions: (1) numerosity (a `class [so large] that joinder of all members is impracticable'); (2) commonality (`questions of law or fact common to the class'); (3) typicality (named parties' claims or defenses `are typical .. . of the class'); and (4) adequacy of representation (representatives `will fairly and adequately protect the interests of the class')." Id., 521 U.S. at 612 (alteration in original)."In addition to satisfying Rule 23(a)'s prerequisites, parties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3)." Id. at 614, 117 S.Ct. 2231.
 
 
 49
 The only requirement at issue in this case is the adequacy of representation requirement. The proper resolution of this issue requires that two questions be addressed: (a) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (b) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class? See Hanlon, 150 F.3d at 1020 (citing Lerwill v. Inflight Motion Pictures, Inc., 582 F.2d 507, 512 (9th Cir. 1978)).
 
 
 50
 a. Conflicts of Interest
 
 
 51
 Clearly, there would be no conflict of interest between the Class Representatives and the members of the class if the class were limited to those investors who purchased Mego common stock during the period commencing April 17, 1995 through and including November 9, 1995 (the "Late Purchasers"). The potential conflict arises because the class includes both Late Purchasers and Early Purchasers,[5] and the Plan of Distribution favors the Late Purchasers. See Amchem, 521 U.S. at 620-21 (in settlement-only class certification the terms of Settlement and Plan of Distribution are relevant in determining whether class should be certified).
 
 
 52
 To repeat, the Plan of Distribution utilizes a rescissory measure of damages under which the Early Purchasers recover nothing from Mego. See discussion supra Part II.B.2. However, were the out-of-pocket measure of damages used the Early Purchasers would be entitled to recover damages from Mego in an amount equal to "the difference between the price and value of the stock on the date of purchase even though they ultimately [could sell] the stock for more than they paid for it."[6] Green , 541 F.2d at 1346 (Sneed, J., concurring).
 
 
 53
 The conflict between class members regarding the most favorable measure of damages can create a potential conflict of interest between members of the class. However, in this case any conflict is illusory. The Early Purchasers could never get out-of-pocket damages because they, including Nadler, did not file suit prior to the effective date of the PSLRA. Therefore, while they would have been free to bring a class action suit against Mego it would have been subject to the PSLRA, which would have limited their damages to the rescissory measure of damages. Therefore, the only way the Early Purchasers could have possibly recovered out-of-pocket damages was to piggy back their claims on the pre-PSLRA claims of the Class Representatives Dunleavy and Peyser. This should not serve as a basis for the creation of a conflict of interest between the class members.
 
 
 54
 It could be argued that the inclusion of the Early Purchasers in the class was improper. However, both Late Purchasers and Early Purchasers were allegedly damaged by the fraud and the necessity for disposing of all potential claims justifies the inclusion of the Early Purchasers. Further, although the parties did not raise the issue it is doubtful that the creation of subclasses would have readily satisfied the Early Purchasers without creating further problems for the fair adjudication of the claims against Mego.[7]
 
 
 55
 Finally, our position is strengthened by two practical considerations. First, Early Purchasers were free to opt-out of the class and only one potential class member chose to opt-out. Second, were we to decertify the current class it is possible that no one will recover anything from Mego. The present Settlement at least allows damages for some members of the class where damages might otherwise be unobtainable for any member of the class.
 
 
 56
 b. Vigorousness of Class Counsel
 
 
 57
 Nadler also argues that Class Counsel did not vigorously prosecute the action on behalf of the class. He asserts that they confined themselves to settlement negotiations and never intended to pursue litigation. In assessing the vigor with which the Class Counsel prosecuted the action in the context of a settlement only class we must assess the rationale for not pursuing further litigation. See Hanlon, 150 F.3d at 1021.
 
 
 58
 There were many reasons not to pursue further litigation. Complex litigation is inherently uncertain and Plaintiffs would have had much difficulty proving scienter. In addition, the issues in this case involved complex and highly technical areas of real estate accounting. Even the Deloitte partners could not agree on the appropriate accounting treatment for these complex transactions.
 
 
 59
 The district court considered these difficulties in determining that Class Counsel had valid reasons for not further pursuing the litigation. Its finding was not clearly erroneous.
 
 III
 
 60
 Finally, the district court did not abuse its discretion in awarding attorney's fees to Class Counsel and in awarding an incentive award to the Class Representatives. See Hanlon, 150 F.3d at 1029; In re SmithKline Beckman Corp. Sec. Litig., 751 F.Supp. 525, 535 (E.D. Pa. 1990).
 
 
 61
 Accordingly, the decision of the district court is AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 The individual defendants are: (1) Robert Nederlander, Chairman of the Board and CEO of Mego during the Class Period; (2) Jerome Cohen, President of Mego during the Class Period; (3) Herbert Hirsch, CFO of Mego during the Class Period; and (4) Wilbur Ross, Outside Director of Mego during the Class Period and Senior Partner in Rothschild & Co., an investment banking firm.
 
 
 [2]
 Mego stock never sold for more than $6.125 per share from January 14, 1994 through April 14, 1995. Thus, those who purchased Mego stock during this period (the "Early Purchasers") do not recover damages from Mego because they could recover their purchase price on the open market.
 
 
 [3]
 The PSLRA does not govern this class action but it is instructive. One of its stated purposes was to give statutory guidance to provide certainty in calculating damages in securities fraud cases. See S. REP. 104-98, at 19 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 698. Given the district court's discretion to fashion a remedy, see Blackie v. Barrack, 524 F.2d 891, 909 (9th Cir. 1975), cert. denied, 429 U.S. 816 (1976), we see no reason to ignore the PSLRA's guidance in this case.
 
 
 [4]
 One of the reasons Congress required the 90-day period was because it believed that "[c]alculating damages based on the date the corrective information is disclosed may substantially overestimate plaintiff's actual damages." S. REP. 104-98, at 20 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 699 (emphasis added). The same is true in this case. The median market value of Mego stock during the 90-day period following disclosure was substantially higher than the value of Mego stock the date the corrective information was disclosed. E.R. 429-431. Thus, the post-disclosure "value" of the Mego stock is lower than it would be under the PSLRA.
 
 
 [5]
 To repeat, the Early Purchasers are those investors who purchased Mego common stock during the period commencing January 14, 1994 through and including April 14, 1995.
 
 
 [6]
 For example, assume an Early Purchaser paid $5 per share for his Mego stock and the value of that stock in the absence of fraud would have been $1 per share on the date of purchase. Under the out-of-pocket measure of damages he would be entitled to recover the difference between the price ($5/share) and value ($1/share) of the stock on the date of purchase. Thus, he would be entitled to recover $4 per share from Mego even though he could ultimately sell the stock for more than he paid for it. This particular purchaser would therefore recover $4 per share more under the out-ofpocket measure of damages than under the rescissory measure of damages.
 
 
 [7]
 For example, the district court might have certified a Late Purchaser subclass (opting for the rescissory measure) and an Early Purchaser subclass (opting for the out-of-pocket measure). However, Nadler, who was both an Early Purchaser and a Late Purchaser (a "Mixed Purchaser"), would presumably be a member of both subclasses. A Mixed Purchaser like Nadler could thus have rescinded the unprofitable late purchases while keeping the profitable early purchases. The result would have been inconsistent and perhaps not fair to the defendant Mego.