11-4544-cv
*Acticon AG v. China North East Petroleum, Ltd.*

UNITED STATES COURT OF APPEALS
For the Second Circuit

_____

August Term, 2011

(Argued: May 17, 2012                              Decided: August 1, 2012 )

Docket No. 11-4544-cv

_____

ACTICON AG,

*Plaintiff-Appellant*,

RICARDO ROSADO, Individually and on behalf of all others similarly situated,
STEVEN WEISSMAN, Individually and on behalf of all others similarly situated,
TONY MOORE, Individually and on behalf of all others similarly situated,

*Plaintiffs*,

—v.—

CHINA NORTH EAST PETROLEUM HOLDINGS LIMITED, WANG HONG JUN, ZHANG YANG, JU
GUIZHE, ROBERT C. BRUCE, RALPH E. DAVIS ASSOCIATES, INC.,

*Defendants-Appellees*,

RALPH E. DAVIS, LI JING FU, YU LI GUO, EDWARD M. RULE,

*Defendants*.

_____

Before: WINTER, STRAUB, and LYNCH, *Circuit Judges*.

_____

On appeal from an Order dated October 6, 2011 by the United States District Court for
the Southern District of New York (Miriam Goldman Cedarbaum, *Judge*) granting Defendants-
Appellees' motion to dismiss this securities fraud action for failure to plead economic loss.  The
plaintiffs alleged that the stock price was artificially inflated and dropped soon after the fraud
became known.  We hold that the fact that the price of the stock recovered soon after the price
dropped does not negate an inference of economic loss and loss causation at the pleading stage.

The judgment of the District Court is therefore **VACATED** and the case **REMANDED** for further proceedings not inconsistent with this opinion.

---

JEREMY A. LIEBERMAN (Marc I. Gross, R. James Hodgson, Tamar Weinrib, *on the brief*) Pomerantz Haudek Grossman & Gross, New York, NY, *for Plaintiff-Appellant*.

MICHAEL J. COFFINO, The Crone Law Group, San Francisco, CA (Jaime J. Santos, The Crone Law Group, San Francisco, CA, Lawrence Brocchini, Reaves Parent Lehrer LLP, New York, NY, *on the brief*), *for Defendants-Appellees China North East Petroleum Holdings Limited, Wang Hong Jun, Zhang Yang, and Ju Guizhi*.

EDWIN G. SCHALLERT (Christine Ford, Jared I. Kagan, *of counsel*) Debevoise & Plimpton LLP, New York, NY, *for Defendant-Appellee Robert C. Bruce*.

SAMUEL LLOYD NEAL, Dunn, Neal & Gerger, LLP, Houston, TX (Andrew L Morrison, K & L Gates LLP, *on the brief*), *for Defendant-Appellee Ralph E. Davis Associates, Inc.*

---

STRAUB, *Circuit Judge*:

This case requires us to consider whether the fact that a stock's share price recovered soon after the fraud became known defeats an inference of economic loss in a securities fraud suit. Plaintiff-Appellant Acticon AG ("Acticon") is the lead plaintiff in a consolidated putative class action suit against China North East Petroleum Holdings Limited ("NEP") brought pursuant to §§ 10(b) & 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) & 78t(a), and under SEC Rule 10b-5, 17 C.F.R. § 240.10b-5. Acticon alleges that NEP misled investors about its reported earnings, oil reserves, and internal controls. It further alleges that NEP revealed this information through a series of corrective disclosures and that in the trading days after each disclosure was made, NEP's stock price dropped. NEP argues that these allegations are not sufficient to allege economic loss because its share price rebounded on certain days after the final disclosure to the point that Acticon could have sold its holdings and avoided a

2

loss. We disagree. For the reasons below, we hold this price recovery does not defeat an inference of economic loss. Accordingly, we vacate the judgment of the District Court and remand for further proceedings not inconsistent with this opinion.

**BACKGROUND**

Acticon is the lead plaintiff in a putative securities class action against NEP. Acticon alleges that beginning May 15, 2008, NEP misled investors regarding the financial health and prospects of the company. In brief, Acticon alleges that NEP inflated its proven oil reserves and did not account for certain warrants—which entitle the holder to purchase stock for a fixed price until the expiry date—in accordance with Generally Accepted Accounting Principles ("GAAP"). It also alleges that NEP's former CEO and his mother transferred funds from the company's corporate coffers into their own accounts.

Acticon alleges that this information gradually became public as NEP was required to withdraw its financial statements and revise its prior earnings downwards. NEP announced that it was withdrawing its 2008 and 2009 financial statements on February 23, 2010. On April 15, 2010, NEP announced delays in the filings of its 2009 annual report and Form 10-K. The next day, it announced that it was facing delisting by the New York Stock Exchange ("NYSE") and that there were certain deficiencies in its internal controls concerning accounts payable and business development activities. On April 20, 2010, it announced another downward estimate of its earnings and linked its need to do so to its misvaluation of oil and gas properties. NEP's stock price fell sharply in the days following each of these disclosures.

On May 27, 2010, NEP announced that the NYSE had halted trading of its stock as of May 25, 2010. In the same press release, it further announced the resignation of certain members of management for financial improprieties. Over the summer, Defendant Robert C.

3

Bruce, the chairman of the audit committee, announced in a letter to the Board that he was resigning because he had concerns regarding whether NEP's 2009 financial statements were prepared in accordance with GAAP and whether the company had bribed foreign governmental officials. On September 9, 2010, NEP stock again resumed trading, and its share price dropped nearly 20% on very high volume.

Acticon filed one of several complaints against NEP, various officers and directors, and an independent oil engineering firm that estimated NEP's reserves, regarding these events. On November 19, 2010, the District Court consolidated these complaints into a single action and appointed Acticon lead plaintiff. Although the complaint contains class allegations, the District Court has not yet considered a motion for class certification. On March 22, 2011, the defendants moved to dismiss the consolidated complaint. At oral argument on May 12, 2011, the District Court expressed concern regarding whether Acticon could show loss causation. It observed that Acticon had foregone several opportunities to sell its shares at a higher price and requested supplemental briefing on the issue.

After supplementary briefing, the District Court granted defendants' motion to dismiss. It held as a matter of law that Acticon did not suffer an economic loss, grounding its holding in a line of cases applying *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005). In its words, "Since *Dura*, courts have held as a matter of law that a purchaser suffers no economic loss if he holds stock whose post-disclosure price has risen above purchase price—even if that price had initially fallen after the corrective disclosure was made." *In re China Ne. Petroleum Holdings Ltd. Secs. Litig.*, 819 F. Supp. 2d 351, 352 (S.D.N.Y. 2011). It observed that Acticon had purchased 60,000 NEP shares with an average purchase price of $7.25 per share. *Id*. at 353. NEP stock had closed at a price higher than $7.25 on twelve days during October and November

4

2010 after NEP was relisted. *Id.* The District Court held that because Acticon had foregone multiple opportunities to sell its shares at a profit, it had not suffered an economic loss. *Id.* It therefore dismissed the consolidated complaint. *Id.* at 354.

This appeal followed.

**DISCUSSION**

We review a dismissal under Federal Rule of Civil Procedure 12(b)(6) de novo, accepting as true all factual allegations in the complaint and drawing all reasonable inferences in favor of Acticon. *Muto v. CBS Corp.*, 668 F.3d 53, 56 (2d Cir. 2012).

"The Supreme Court has held that, to maintain a private damages action under § 10(b) and Rule 10b-5, 'a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *Pac. Inv. Mgmt. Co. LLC v. Mayer Brown LLP*, 603 F.3d 144, 151 (2d Cir. 2010) (quoting *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)), *cert. denied sub nom. RH Capital Assocs. LLC v. Mayer Brown LLP*, 131 S. Ct. 3021 (2011). NEP argues that because its stock price rose higher than Acticon's average purchase price on various dates in the months following the close of the class period, Acticon has failed to plead economic loss as a matter of law.[1]

After *Dura*, it is unclear whether the plaintiffs must satisfy the "short and plain statement of the claim" standard demanded by Rule 8(a)(2) or the more stringent heightened pleading requirements of Rule 9(b) in pleading economic loss. In *Dura*, the Supreme Court "assume[d],

---

[1] In making this argument, NEP relies upon information outside of the four corners of the complaint, specifically historical data about stock prices. We are entitled to take judicial notice of well publicized stock prices without converting the motion to dismiss into one for summary judgment. *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 n.8 (2d Cir. 2000).

at least for argument's sake, that neither the Rules nor the securities statutes impose any special further requirement in respect to the pleading of proximate causation or economic loss." 544 U.S. at 346.

Although we are aware of no decision by our sister Circuits considering which pleading standard plaintiffs must satisfy to adequately allege economic loss in the wake of *Dura*, several Circuits have considered which pleading standard applies to loss causation. This analysis is instructive because *Dura* considered the two elements together and left the pleading standard applicable to loss causation equally ambiguous. The Circuits have split in the wake of *Dura* as to which rule applies to loss causation. The Fourth Circuit has held that heightened pleading requirements of Rule 9(b) apply to the element of loss causation because it is "among the circumstances constituting fraud." *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 471 & n.5 (4th Cir. 2011) (internal quotations omitted). The Fifth Circuit, in contrast, has held that only the requirements of Rule 8(a)(2) apply, relying upon the fact that the Supreme Court in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), construed *Dura* in formulating its plausibility standard. *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 256-58 (5th Cir. 2009). And the Ninth Circuit has recognized that ambiguity exists regarding which pleading standard applies, but has found it unnecessary to resolve which standard applies because in each case where it could address the issue, either pleading standard was satisfied. *See WPP Lux. Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1053-1054 (9th Cir. 2011); *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1056 (9th Cir. 2008). Because we find that the price fluctuations here would not rebut an inference of economic loss under either standard, we, like the Ninth Circuit, find it unnecessary to resolve this issue at this time.

6

Traditionally, economic loss in Section 10(b) cases has been determined by use of the "out-of-pocket" measure for damages. Under that measure, "a defrauded buyer of securities is entitled to recover only the excess of what he paid over the value of what he got." *Levine v. Seilon*, 439 F.2d 328, 334 (2d Cir. 1971) (Friendly, J.). In other words, damages "consist[] of the difference between the price paid and the 'value' of the stock when bought." *Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156, 168 (2d Cir. 1980). The Supreme Court adopted the out-of-pocket measure of damages in *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 155 (1972). Referring to 15 U.S.C. § 78bb(a)(1), which limits recovery to "actual damages" for violations of the Securities Exchange Act of 1934, the Supreme Court held that "the correct measure of damages under § 28 of the Act, 15 U.S.C. § 78bb(a), is the difference between the fair value of all that the [plaintiff] received and the fair value of what he would have received had there been no fraudulent conduct." *Id*.

In the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub. L. No. 104-67, 109 Stat. 737 (1995), Congress included a "bounce back" provision that caps the amount of damages available in a securities fraud action. The provision states that

> in any private action . . . in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid . . . by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market.

15 U.S.C. § 78u-4(e)(1).[2] The provision further defines "mean trading price" as "an average of the daily trading price of that security, determined as of the close of the market each day during the 90-day period." *Id*. § 78u-4(e)(3). In essence, this provision "does not calculate damages

_____

[2] Plaintiffs who sell their securities prior to the close of the 90-day period are subject to a damage cap of the difference between purchase price and the average trading price between the date of disclosure and the sale date. 15 U.S.C. § 78u-4(e)(2).

7

based on the single day decline in price, but instead allows the security an opportunity to recover" over a period of 90 days. *In re Veritas Software Corp. Sec. Litig.*, 496 F.3d 962, 967 n.3 (9th Cir. 2007). "Thus, if the mean trading price of a security during the 90-day period following the correction is greater than the price at which the plaintiff purchased his stock then that plaintiff would recover nothing under the PSLRA's limitation on damages." *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 461 (9th Cir. 2000) (emphasis omitted). But if the mean trading price during the 90-day period is less than the plaintiff's purchase price, then the plaintiff may recover out-of-pocket damages up to the difference between her purchase price and the mean trading price.

The PSLRA's legislative history indicates that Congress imposed this limitation because it believed that "[c]alculating damages based on the date corrective information is disclosed may substantially overestimate plaintiff's actual damages." S. Rep. No. 104-98, at 20 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 699. It intended the "bounce back" provision to have the effect of "limiting damages to those losses caused by the fraud and not by other market conditions." *Id.* Aside from imposing the "bounce back" cap on recoverable damages, Congress did not otherwise disturb the traditional out-of-pocket method for calculating damages in the PSLRA. *See In re Royal Dutch/Shell Trans. Sec. Litig.*, 404 F. Supp. 2d 605, 609-10 (D.N.J. 2005) (noting that the bounce back provision "is consistent with the out-of-pocket loss measure of damages traditionally applied by courts").

The limitation upon damages imposed by the District Court—and by the other district court decisions upon which it relied—is inconsistent with both the traditional out-of-pocket measure for damages and the "bounce back" cap imposed in the PSLRA. This line of cases, beginning with *Malin v. XL Capital Ltd.*, holds that a securities fraud plaintiff suffers no

economic loss if the price of the stock rebounds to the plaintiff's purchase price at some point after the final alleged corrective disclosure. No. 03 Civ. 2001, 2005 WL 2146089, at *4 (D. Conn. Sept. 1, 2005); *see also Ross v. Walton*, 668 F. Supp. 2d 32, 43 (D.D.C. 2009); *In re Immucor, Inc. Sec. Litig.*, No. 09-CV-2351, 2011 WL 3844221, at *2 (N.D. Ga. Aug. 29, 2011); *In re Veeco Instruments, Inc. Secs. Litig.*, 05-MD-1695, 2007 WL 7630569, at *7 (S.D.N.Y. June 28, 2007).

The *Malin* court correctly noted that the fact that the price rebounded does not, at the pleading stage, negate the plaintiff's showing of loss causation. The *Malin* court reasoned that determining why a stock's price rebounded after an initial drop requires the court to consider "a competing theory of causation and raises factual questions not suitable for resolution on a motion to dismiss." *Malin*, 2005 WL 2146089, at *4 n.5. We agree with the *Malin* court's analysis on this point. The defendants here argue that the rebound in share price demonstrates that the market was unfazed by the alleged corrective disclosures, so the disclosures were unrelated to Acticon's ultimate loss. At this stage in the litigation, we do not resolve why the NEP's share price rose after its initial fall and instead, drawing all reasonable inferences in favor of Acticon, assume that the price rose for reasons unrelated to its initial drop.

The *Malin* court held, however, that a rebound in stock price three months after the close of a class period negates an inference of economic loss. *Id.* at *4. In reaching this holding, *Malin* and the courts following it have extrapolated from the Supreme Court's decision in *Dura*. In *Dura*, the Court rejected the Ninth Circuit's holding that securities fraud plaintiffs need only demonstrate "that the price *on the date of purchase* was inflated because of the misrepresentation." 544 U.S. at 342 (internal quotation marks omitted). According to the Court, "this statement of the law is wrong" because ordinarily in fraud-on-the-market cases "an inflated

9

purchase price will not itself constitute or proximately cause the relevant economic loss." *Id.* As the Court explained, "[A]s a matter of pure logic, at the moment the transaction takes place, the plaintiff has suffered no loss; the inflated purchase payment is offset by ownership of a share that *at that instant* possesses equivalent value." *Id.* Moreover, the "logical link between the inflated share purchase price and any later economic loss is not invariably strong." *Id.* For example, a purchaser might "sell[] the shares quickly before the relevant truth begins to leak out," with the result that "the misrepresentation will not have led to any loss." *Id.* Further, even if a purchaser sells at a lower price *after* a corrective disclosure is made, "that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price." *Id.* at 342-43. Accordingly, the Court rejected the Ninth Circuit's approach, which "would allow recovery where a misrepresentation leads to an inflated purchase price but nonetheless does not proximately cause any economic loss." *Id.* at 346.

The Court's holding, by its own terms, was quite limited. It concluded,

> In sum, we find the Ninth Circuit's approach inconsistent with the law's requirement that a plaintiff prove that the defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss. We need not, and do not, consider other proximate cause or loss-related questions.

*Id.* This holding does not alter or abandon the traditional out-of-pocket measure for damages described above, under which damages "consist[] of the difference between the price paid and the 'value' of the stock" when purchased. *Elkind*, 635 F.2d at 168. Rather, the Court merely clarified that a securities fraud plaintiff who purchased stock at an inflated purchase price must still prove that she suffered an economic loss, and that that loss was proximately caused by defendant's misrepresentation. Acticon satisfies the pleading requirements of *Dura* because it

10

has alleged something more than the mere fact that it purchased NEP shares at an inflated price; specifically, it alleges that the price of NEP stock dropped after the alleged fraud became known.

The *Malin* court adopted a more expansive view of the Supreme Court's holding in *Dura*. It took as its starting point the Supreme Court's observation that "at the moment the transaction takes place, the plaintiff has suffered no loss; the inflated purchase payment is offset by ownership of a share that at that instant possesses equivalent value." 544 U.S. at 342. The court reasoned,

> [A] price fluctuation without any realization of an economic loss is functionally equivalent to the Supreme Court's rejection of an artificially inflated purchase price alone as economic loss. If the current value is commensurate to the purchase prices, there is no loss, regardless of whether the purchase price was artificially inflated. Thus, under the circumstances, Plaintiffs' allegations of an economic loss are insufficient when considered in conjunction with the evidence of price recovery.

*Malin*, 2005 WL 2146089, at *4. This reasoning is inconsistent with the traditional out-of-pocket measure of damages, which calculates economic loss based on the value of the security at the time that the fraud became known, and with the PSLRA's bounce-back provision, which refines the traditional measure by capping recovery based on the mean price over the look-back period.

Further, a share of stock that has regained its value after a period of decline is not functionally equivalent to an inflated share that has never lost value. This analysis takes two snapshots of the plaintiff's economic situation and equates them without taking into account anything that happened in between; it assumes that if there are any intervening losses, they can be offset by intervening gains. But it is improper to offset gains that the plaintiff recovers after the fraud becomes known against losses caused by the revelation of the fraud if the stock recovers value for completely unrelated reasons. Such a holding would place the plaintiff in a worse position than he would have been absent the fraud. Subject to the bounce-back limitation

11

imposed by the PSLRA, a securities fraud action attempts to make a plaintiff whole by allowing him to recover his out-of-pocket damages, that is, the difference between what he paid for a security and the uninflated price. *See Levine*, 439 F.2d at 334. In the absence of fraud, the plaintiff would have purchased the security at an uninflated price and would have also benefitted from the unrelated gain in stock price. If we credit an unrelated gain against the plaintiff's recovery for the inflated purchase price, he has not been brought to the same position as a plaintiff who was not defrauded because he does not have the opportunity to profit (or suffer losses) from "a second investment decision unrelated to his initial decision to purchase the stock." *Harris v. Am. Inv. Co.*, 523 F.2d 220, 228 (8th Cir. 1975), *cert. denied*, 423 U.S. 1054 (1976). We are aware of no circuit court or Supreme Court decision imposing the economic-loss rule embraced by *Malin*, and we find it significant that the PSLRA, while it did impose the 90-day bounce back limit on damages, did not impose the limitation on damages favored by *Malin*.

At this stage in the litigation, we do not know whether the price rebounds represent the market's reactions to the disclosure of the alleged fraud or whether they represent unrelated gains. We thus do not know whether it is proper to offset the price recovery against Acticon's losses in determining Acticon's economic loss. Accordingly, the recovery does not negate the inference that Acticon has suffered an economic loss.

NEP and co-defendants advance a number of alternate grounds for affirmance, but we believe it more appropriate for the District Court to consider these arguments in the first instance.

**CONCLUSION**

For the reasons above, the judgment of the District Court is **VACATED** and the case **REMANDED** for further proceedings not inconsistent with this opinion.