**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

AMISH DESAI; ELIZABETH LAMB;
THERESE LONG; CHRISTOPHER LONG,
      *Plaintiffs-Appellants,*

      v.

DEUTSCHE BANK SECURITIES
LIMITED; DEUTSCHE BANK
SECURITIES INC.; DEUTSCHE BANK
AG,

      *Defendants-Appellees.*

No. 08-55081

D.C. No.
CV-01-09024-SVW

OPINION

Appeal from the United States District Court
for the Central District of California
Stephen V. Wilson, District Judge, Presiding

Argued and Submitted
May 7, 2009—Pasadena, California

Filed July 29, 2009

Before: John T. Noonan, Diarmuid F. O'Scannlain, and
Susan P. Graber, Circuit Judges.

Per Curiam Opinion;
Concurrence by Judge O'Scannlain;
Concurrence by Judge Graber

9899

**COUNSEL**

Joseph J. Tabacco, Jr., Berman, DeValerio, Pease, Tabacco Burt & Pucillo, San Francisco, California, argued the cause for the appellants and was on the briefs. Nicole Lavallee, Berman, DeValerio, Pease, Tabacco, Burt & Pucillo, San Francisco, California, filed briefs. James C. Magid, Berman, DeValerio, Pease, Tabacco, Burt & Pucillo, San Francisco, California, and Ira M. Press, Kirby, McInerney LLP, New York, New York, were also on the briefs.

James H.R. Windels, Davis, Polk & Wardwell, New York, New York, argued the cause for the appellees and filed the brief.

**OPINION**

PER CURIAM:

We must decide whether a putative class can be certified in this securities fraud class action.

I

This appeal stages the last act of a long drama that followed the collapse of an elaborate stock manipulation scheme.

A

GenesisIntermedia, Inc. ("GENI") is a Delaware corporation with its registered address in California. Its stock once traded on the NASDAQ, but since late 2001 has traded over the counter but off the NASDAQ.[1] Turmoil in GENI's stock price began in the fall of 2001 and continued as the details emerged of what the plaintiffs allege was a sophisticated scheme to manipulate the price of the company's stock.

1

Appellants—Amish Desai, Christopher and Therese Long, and Elizabeth Lamb ("Investors")—allege that Deutsche Bank Securities Ltd. ("DBSL"), Deutsche Bank Securities, Inc., and Deutsche Bank AG (collectively, "Deutsche Bank"), through Wayne Breedon, a vice-president at DBSL, masterminded this stock price manipulation scheme.[2] Breedon and Deutsche

---

[1]The National Association of Securities Dealers Automatic Quotation System, or NASDAQ, is a tool used to report the prices of millions of stocks not traded on any domestic exchange (so-called "over-the-counter" stocks). Not every stock traded over the counter is registered to trade on the NASDAQ.

[2]Breedon is the main actor in the alleged scheme. He worked for DBSL in Toronto, Canada, which is a wholly owned subsidiary of Deutsche

Bank, however, played only one part in the plot that Investors allege. Some background, therefore, is necessary.

A common way to manipulate the market in a security is to cause its price to increase by creating the illusion of more investor interest than really exists. The manipulator acquires shares of the security before the price increase, then slowly sells them off and reaps the profit. The problem with this model, however, is that as the manipulator sells off his shares he depresses the price, which lessens his profit. Investors here allege a scheme that varied the theme in a way designed to cure this problem. It involved a commercial arrangement known as a securities loan.

In the typical securities loan, a broker-dealer lends securities to another broker-dealer, the loan being secured by cash collateral the borrower gives to the lender. *See generally Stephenson v. Deutsche Bank AG*, 282 F. Supp. 2d 1032, 1044-45 (D. Minn. 2003). The borrower of the security receives so-called rebate payments, which are like interest on the cash collateral he has transferred to the security lender.[3] As the value of the security increases, the amount of cash collateral and the level of interest also increase. Adjustments—marking the securities to the market—are made daily.

---

Bank AG. Breedon's activities at DBSL were supervised by Deutsche Bank Securities, also a subsidiary of Deutsche Bank AG. Liability for Deutsche Bank is premised on one of two theories: that Breedon acted as the agent of Deutsche Bank or that he acted within the scope of his employment so as to invoke the doctrine of respondeat superior. The validity of these theories of recovery is not at issue in this appeal.

[3]This is not a typical creditor-debtor relationship, for the borrower, instead of the lender, receives a stream of income that resembles interest payments. One might be tempted to think of the arrangement as a loan of money secured by stock, but we adhere to the characterization used in the industry, as no legal issues before us turn on the question.

2

According to Investors, a web of schemers (including several persons no longer defendants) used securities loans to profit contemporaneously with the inflation of GENI's stock price, rather than by selling the stock after the price rose (which would have depressed the price). It worked as follows.[4]

Officers of GENI first issued themselves unregistered shares of the company. Such shares may not be publicly traded, but the GENI officers loaned them to a broker-dealer called Native Nations Securities, Inc., receiving cash collateral in return. Richard Evangelista, an employee of Native Nations and apparently a longtime associate of Breedon, falsified the records of his employer to make it look like the GENI shares had come from other broker-dealers. Native Nations then lent the shares (cash collateral coming back) to Deutsche Bank. Breedon was in charge of this account, which continued to absorb unregistered shares of GENI stock. Eventually, Breedon and his associates at GENI developed a chain of broker-dealers that came between Native Nations and Deutsche Bank in order to increase the amount of capital for the scheme and to insulate Deutsche Bank from any fallout should the scheme collapse.

The GENI officers used the cash collateral to day-trade in GENI's publicly traded shares. This created the appearance of investor demand. That appearance inflated the stock price, which in turn required the borrowers of GENI stock, from Native Nations to Deutsche Bank, to provide more cash collateral to feed the cycle. It also increased the rebate payments to the borrowers, from Native Nations down the line to Deutsche Bank. It seems Deutsche Bank gained the most from the rebate payments, however, because the intermediary broker-dealers in the chain paid out a percentage of the rebates they

---

[4]We present here a simplified version of the alleged scheme. For further details, *see Stephenson*, 282 F. Supp. 2d at 1045-51.

received to the next party in the chain. Deutsche Bank, being the last in line, did not have to do that.

To ensure that GENI's price kept climbing, Breedon and his associates at GENI allegedly paid off two stock analysts to recommend GENI stock in order to drum up demand. One of the analysts was Courtney Smith, a one-time defendant in this litigation; the Longs claim that they purchased GENI stock in February of 2000 on the basis of Smith's bogus recommendations. The secret deal between GENI and Smith later came to light in the news media.

As the district court put it, this scheme solved the classic problem of market manipulators everywhere: it allowed them to profit from fraudulently inflating a stock's price without having to sell the shares.

3

By September 11, 2001, the scheme had driven GENI's stock price from $12 per share to over $52 per share. The terrorist attacks that day stopped all trading in the markets until September 17. When trading resumed, the share price fell dramatically for reasons that are unclear. By September 25, GENI stock was down to $9 per share, at which point trading in the stock was suspended. GENI delisted its stock from NASDAQ soon after; it now trades for pennies.

As the price collapsed in September of 2001, borrowers of the stock, starting with Deutsche Bank, demanded their cash collateral back. The cash calls went up the chain to Native Nations. Though Deutsche Bank was able to recover nearly all the collateral it had pledged, the intermediary broker-dealers were not so lucky. GENI had spent the cash collateral, so it could not return it to Native Nations, which left the broker-dealer, and many of the other broker-dealers between it and Deutsche Bank, insolvent. Thus, Deutsche Bank had profited through the rebate payments it received, but it had

managed to recover almost of all the cash collateral it had advanced.

B

Investors seek to represent a class of people who bought GENI stock in the putative class period, which is December 21, 1999, to September 25, 2001. They sue under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 ("the 1934 Act"), codified at 15 U.S.C. §§ 78j(b) and 78t(a), respectively. Desai, the lead plaintiff, purchased 50,000 shares on the last day of the period. Lamb bought 100 shares on September 20, 2001. The Longs, as mentioned, bought their 100 shares in February of 2000 after seeing analyst Courtney Smith's recommendations on television.

1

This case began over seven years ago, but it remains at the class certification stage. In October of 2001, several parties, Desai apparently among them, filed putative class actions in United States District Court for the Central District of California, Judge Stephen V. Wilson presiding. Originally, they alleged that GENI, its officers, and their associates had made misrepresentations to the public or paid others to do so to inflate the price of GENI stock. Deutsche Bank was not named a defendant.

After some preliminary wrangling over who would be the lead plaintiff, the California district court appointed Horizon International, LLC, an institutional investor, and Desai as lead plaintiffs. When the Third Amended Complaint, on which the two district court opinions relevant to this appeal are based, was filed, Desai and Horizon were the only representative plaintiffs.

In June of 2003, the California district court transferred the case to the United States District Court for the District of

Minnesota, where related proceedings were pending in the bankruptcy of MJK Clearing Inc., one of the unfortunate broker-dealers in the chain between Deutsche Bank and GENI. *See In re GenesisIntermedia, Inc. Sec. Litig.*, 232 F. R. D. 321 (D. Minn. 2005). Investors' counsel added Lamb and the Longs as class representatives, and Horizon withdrew as lead plaintiff. Then Investors moved for certification of the class pursuant to Federal Rule of Civil Procedure 23(b)(3). In December of 2005, the Minnesota district court denied the motion. The Eighth Circuit denied Investors' petition for interlocutory appeal, and the Minnesota district court transferred the case back to Judge Wilson in California.

2

In March of 2006, the case was reopened in the Central District of California. A little more than two months later, the district court allowed Investors to renew their motion for class certification. Judge Wilson ultimately denied the motion one day after Investors filed a Fourth Amended Complaint. The district court's order denying the motion therefore assumes that the Third Amended Complaint is the operative complaint, although it was aware that the Longs and Lamb had been added as representative plaintiffs.[5] After that, default judgment was entered against some of the defendants, including Breedon, and the claims against the other defendants, except for Deutsche Bank, were dismissed. The last defendant standing, and the only one before us, is Deutsche Bank.

---

[5]In general, "an amended pleading supersedes the original pleading," which is "treated thereafter as non-existent." *Ferdik v. Bonzelet*, 963 F.2d 1258, 1262 (9th Cir. 1992) (internal quotation marks omitted). Thus, at the time the district court ruled, the Fourth Amended Complaint had superseded the Third. It would be pointless to remand for the district court to consider the Fourth Amended Complaint, however, because the two complaints substantially overlap as far as Deutsche Bank is concerned. We therefore base our decision on the Fourth Amended Complaint, noting relevant differences between it and the Third.

The class representatives then negotiated, as individuals, a settlement with Deutsche Bank, but explicitly preserved their rights to appeal the denial of class certification. The district court entered final judgment and Investors timely appeal.

## II

## A

Federal Rule of Civil Procedure 23 governs when a district court may certify a class. All classes must meet the four prerequisites of Rule 23(a) and fall into one of the three categories of class actions defined in Rule 23(b). The Minnesota district court addressed the Rule 23(a) prerequisites, but the California district court ruled only on Rule 23(b) grounds. Some of our sister circuits have concluded that the interlocutory orders of out-of-circuit district courts that transfer a case to an in-circuit district court are reviewable on appeal of the transferee court's judgment. *See, e.g.*, *Chaiken v. VV Publ'g Corp.*, 119 F.3d 1018, 1025 n.2 (2d Cir. 1997) ("We have jurisdiction to review the interlocutory judgment of the United States District Court for the District of Massachusetts entered prior to the transfer of the case to a district court within our jurisdiction and the issuance by that court of a final order."). We need not decide whether to endorse such position, however, as we can decide this case on Rule 23(b) alone.

**[1]** Specifically, Investors seek certification under Rule 23(b)(3). To certify under that provision, the district court must find, first, "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members," and, second, "that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3) (2005).[6] The rule also lists the following "matters pertinent" to the certification decision:

---

[6]The Federal Rules have since been amended to make stylistic changes, but we quote the rules as they were when the complaint was filed.

> (A) the interests of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

*Id.*

The California district court concluded that individual questions of law or fact predominated over common ones, which sufficed to take the putative class outside of Rule 23(b)(3). The district court focused on the element of reliance,[7] which is required to prove a violation of § 10(b) of the 1934 Act. The district court's denial of class certification depended on its belief that Investors would have to prove reliance on an individual basis because they could not prove it class-wide.[8] *See Basic Inc. v. Levinson*, 485 U.S. 224, 242 (1988) (recognizing that such individualized proof of reliance effectively makes it impossible to proceed as a class, because "individual issues then would . . . overwhelm[ ] the common ones").

A ruling on class certification "is subject to a very limited review and will be reversed only upon a strong showing that the district court's decision was a clear abuse of discretion." *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 461 (9th Cir. 2000) (internal quotation marks omitted). The inquiry turns on whether the district court faithfully applied the require-

---

[7] We discuss reliance in detail *infra*, at 9914.

[8] The district court also ruled that a class action was not superior to other methods of adjudicating this controversy, but only because individual issues of law and fact predominated over common ones. As it would be duplicative, we do not analyze that portion of the district court's Rule 23(b)(3) analysis.

ments of Rule 23(b)(3). *See, e.g.*, *Armstrong v. Davis*, 275 F.3d 849, 867-68 (9th Cir. 2001). To review the district court's decision, we must understand the underlying causes of action.

B

Investors bring two claims against Deutsche Bank. First, they allege a violation of § 10(b) of the 1934 Act and Rule 10b-5, promulgated thereunder.[9] They also allege a violation of § 20(a). Section 20(a) extends liability for violations of other provisions of the 1934 Act, including § 10(b), to certain so-called "controlling persons." Thus, in this case liability under § 20(a) turns on a violation of § 10(b). The district court evaluated the questions of law or fact with respect to the underlying liability for a violation of § 10(b), not with respect to § 20(a). We therefore put § 20(a) aside.

Section 10(b) makes it "unlawful for any person, directly or indirectly . . . (b) [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in contravention of [the SEC's rules and regulations]." 15 U.S.C. § 78j. Rule 10b-5 categorizes violations of the statute into three categories:

> (a) [t]o employ any device, scheme, or artifice to defraud[;]
>
> (b) [t]o make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circum-

---

[9]The Supreme Court has long inferred a private cause of action from the statute. *See Superintendent of Ins. of N.Y. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 13 n.9 (1971) ("It is now established that a private right of action is implied under § 10(b).").

stances under which they were made, not misleading[;] or

(c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

**[2]** The words are capacious, to be sure, and "[w]hen we deal with private actions under Rule 10b-5, we deal with a judicial oak which has grown from little more than a legislative acorn." *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 737 (1975). All the same, "Rule 10b-5 encompasses only conduct already prohibited by § 10(b)." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 128 S. Ct. 761, 768 (2008). Thus, the cause of action must be based either on a "manipulative" device or contrivance or on a "deceptive" one. *See* 15 U.S.C. § 78j(b); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).

**[3]** Courts have generally categorized deceptive and manipulative devices into misrepresentations, omissions by those with a duty to disclose, or manipulative acts. *See, e.g.*, *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000) ("Section 10(b) of the Exchange Act bars conduct involving manipulation or deception, manipulation being practices that are intended to mislead investors by artificially affecting market activity, and deception being misrepresentation, or nondisclosure intended to deceive." (internal quotation marks and alteration omitted)); *see also Stoneridge*, 128 S. Ct. at 769; *Cent. Bank of Denver v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 177 (1994). Misrepresentations and most omissions fall under the prohibition of Rule 10b-5(b), whereas manipulative conduct typically constitutes "a scheme . . . to defraud" in violation of Rule 10b-5(a) or a "course of business which operates . . . as a fraud or deceit upon any per-

son" in violation of Rule 10b-5(c). *See, e.g.*, *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 335 (S.D.N.Y. 2003) (treating manipulation as a violation of Rule 10b-5(a) or (c) and misrepresentations and omissions as violations of Rule 10b-5(b)).

**[4]** Here, Investors allege manipulative conduct and omissions by Deutsche Bank.[10] "Manipulation," the Supreme Court has recognized, "is virtually a term of art when used in connection with securities markets. The term refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity." *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977) (internal quotation marks and citation omitted). As for omissions, the term generally refers to the failure to disclose material information about a company, as opposed to affirmative manipulation. *See Basic*, 485 U.S. at 983. The person who omitted the material information must have had a duty to disclose it to the person supposedly harmed by the omission. *See Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1157 (9th Cir. 1996) ("Rule 10b-5 is violated by nondisclosure only when there is a duty to disclose." (internal quotation marks omitted)). Such a duty may arise "from a relationship of trust and confidence between parties to a transaction." *Chiarella v. United States*, 445 U.S. 222, 230 (1980).

**[5]** Regardless of whether a § 10(b) plaintiff alleges a misrepresentation, omission, or manipulation, he must plead and prove the following elements:

> (1) . . . use or employ[ment of] any manipulative or deceptive device or contrivance; (2) scienter, *i.e.* wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance, often

---

[10]As Investors concede, any misrepresentations alleged in the Third Amended Complaint did not pertain to Deutsche Bank.

referred to . . . as "transaction causation;" (5) economic loss; and (6) loss causation, *i.e.* a causal connection between the manipulative or deceptive device or contrivance and the loss.

*Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040, 1047 (9th Cir. 2006), *vacated on other grounds by Avis Budget Group, Inc. v. Cal. State Teachers' Ret. Sys.*, 128 S. Ct. 1119 (2008).

Reliance establishes the causal connection between the alleged fraud and the securities transaction. *See Stoneridge*, 128 S. Ct. at 769 (citing *Basic*, 485 U.S. at 243). To say that a plaintiff relied on a defendant's bad act is to say that the defendant's actions "played a substantial part in the plaintiff's investment decision." *Rowe v. Maremont Corp.*, 850 F.2d 1226, 1233 (7th Cir. 1988). It is thus "often referred to in cases involving the public securities markets . . . as 'transaction causation,' " *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341 (2005), presumably because reliance requires an investor-plaintiff to show that he would not have engaged in the transaction in question had he known about the fraud.

**[6]** Reliance can be presumed in two situations. In omission cases, courts can presume reliance when the information withheld is material pursuant to *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153-54 (1972). Reliance can also be presumed in certain circumstances under the so-called "fraud on the market theory." *Basic*, 485 U.S. at 241-49. Precisely to which cases this presumption applies—that is, to misrepresentation, to omission, to manipulation cases, or to some combination of the three—is an issue the parties contest on appeal. The two presumptions are conceptually distinct.

**[7]** The fraud on the market theory bears some additional explanation. It is a way to show "the requisite causal connection between a defendant's [bad act] and a plaintiff's injury," *id.* at 243, that lies at the heart of the element of reliance. The theory allows plaintiffs to rely on a "rebuttable presumption

of investor reliance based on the theory that investors presumably rely on the market price, which typically reflects the misrepresentation or omission." *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 934 n.12 (9th Cir. 2003). The presumption is "based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business." *Basic*, 485 U.S. at 241 (internal quotation marks omitted). Therefore, the presumption is usually available "only when a plaintiff alleges that a defendant made material representations or omissions concerning a security that is actively traded in an 'efficient market.' " *Binder v. Gillespie*, 184 F.3d 1059, 1064 (9th Cir. 1999). In other words, the theory allows the plaintiff to connect causally the defendant's bad act with the plaintiff's decision to buy or sell the security, by presuming that the plaintiff based his decision on the price of the security and that such price reflects the defendant's bad act.

## III

The district court concluded that neither the *Affiliated Ute* presumption of reliance nor the fraud on the market presumption of reliance applied in this case. The *Affiliated Ute* presumption did not apply, according to the court, because this was not primarily an omissions case. The district court rejected the application of the fraud on the market presumption because, by their own admission, Investors could not show an efficient market. Finally, the court rejected their invitation to create a novel presumption of reliance on "the integrity of the market" in the context of manipulation cases. Whether or not they can rely on a presumption of reliance determines whether their putative class can meet the requirements of Rule 23(b)(3). For without a class-wide presumption, Investors would have to prove reliance as to each class member individually.

A

The presumption of reliance under *Affiliated Ute* is limited to cases that "can be characterized as . . . primarily alleg[ing] omissions." *Id.* at 1064. Therefore, if Investors' putative class action is not such a case, they cannot avail themselves of the *Affiliated Ute* presumption.

Investors allege that this is an omissions case because "the case as a whole is . . . overwhelmingly non-statement based— in other words, omission-based." In other words, they seem to assume that as long as liability is not based on misrepresentations, then it must be based on omissions. Relatedly, they argue that because Deutsche Bank and the other former defendants "failed to disclose their active manipulation of GENI stock," they have made an actionable omission. This approach would collapse manipulative conduct claims and omission claims.

**[8]** We must recognize, however, that manipulative conduct has always been distinct from actionable omissions.

Omissions are generally actionable under Rule 10b-5(b). As we explained above, they stem from the failure to disclose accurate information relating to the value of a security where one has a duty to disclose it. *Paracor Fin.*, 96 F.3d at 1157. Insider trading cases are a notorious example: the insider who knows nonpublic information and trades on the basis of it has committed an actionable omission. *See, e.g.*, *United States v. O'Hagan*, 521 U.S. 642, 651-52 (1997); *Chiarella*, 445 U.S. at 226-30.

**[9]** Manipulative conduct, by contrast, is actionable under Rule 10b-5(a) or (c) and includes activities designed to affect the price of a security artificially by simulating market activity that does not reflect genuine investor demand. *See Santa Fe*, 430 U.S. at 476-77; *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976) ("[Manipulation] connotes intentional or

willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities."). In order to succeed, manipulative schemes must usually remain undisclosed to the general public. *See Santa Fe*, 430 U.S. at 477. If such nondisclosure of a defendant's fraud was an actionable omission, then every manipulative conduct case would become an omissions case. If that were so, then all of the Supreme Court's discussion of what constitutes manipulative activity would be redundant. We decline to read the Supreme Court's case law on manipulative conduct as little more than an entertaining, but completely superfluous, intellectual exercise. *See Stoneridge*, 128 S. Ct. at 769 (listing the three types of § 10(b) actions); *Cent. Bank*, 511 U.S. at 177 (same).

**[10]** One of our sister circuits has recently come to a similar conclusion. In *Joseph v. Wiles*, 223 F.3d 1155 (10th Cir. 2000), the Tenth Circuit held the *Affiliated Ute* presumption inapplicable in a case involving some omissions, but also misrepresentations and secret manipulation.

> Any fraudulent scheme requires some degree of concealment, both of the truth and of the scheme itself. We cannot allow the mere fact of this concealment to transform the alleged malfeasance into an omission rather than an affirmative act. To do otherwise would permit the *Affiliated Ute* presumption to swallow the reliance requirement almost completely. Moreover, it would fail to serve the *Affiliated Ute* presumption's purpose since this is not a case where reliance would be difficult to prove because it was based on a negative. We therefore hold the *Affiliated Ute* presumption of reliance inapplicable . . . .

*Id.* at 1163. We agree with the Tenth Circuit's approach, which carefully maintained the well-established distinction, for purposes of the *Affiliated Ute* presumption, between omis-

sion claims, on the one hand, and misrepresentation and manipulation claims, on the other.

**[11]** Investors also alleged, and the district court addressed, some omissions in their Third Amended Complaint that do not appear in their Fourth Amended Complaint. As we indicated above, *see supra*, note 5, where the latter complaint differs from the former, we take the latter as operative because it supersedes the prior complaint. Thus, Investors have alleged no actionable omissions and so the *Affiliated Ute* presumption of reliance does not apply.[11]

### B

### 1

**[12]** "'The fraud on the market theory,' " as the Supreme Court has adopted it,

> "is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business. . . . Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements. . . . The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations."

*Basic*, 485 U.S. at 241-42 (quoting *Peil v. Speiser*, 806 F.2d

---

[11]We add that, even if Investors had alleged omissions, they would not be actionable without a duty to disclose the information omitted. *Paracor Fin.*, 96 F.3d at 1157. Because there are no true omissions alleged, however, we do not reach the question whether Deutsche Bank had such a duty in this case.

1154, 1160-61 (3d Cir. 1986) (alteration in original)). Thus, the theory presumes first that "[a]n investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price." *Id.* at 247. Second, "[b]ecause most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations . . . may be presumed for purposes of a Rule 10b-5 action." *Id.*

The second element of the presumption depends upon the efficiency of the market in which the security trades. *See Binder*, 184 F.3d at 1064; *see also Basic*, 485 U.S. at 248 n.27 (listing as an element of the presumption as "that the shares were traded on an efficient market"); *Oscar Private Equity Invs. v. Allegiance Telecom, Inc.*, 487 F.3d 261, 264 (5th Cir. 2007) (listing an efficient market as a prerequisite for application of the fraud on the market theory); *In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1, 7 (1st Cir. 2005) ("Before an investor can be presumed to have relied upon the integrity of the market price, however, the market must be 'efficient.' "); *Hayes v. Gross*, 982 F.2d 104, 106 (3d Cir. 1992) ("Where the security involved is traded in an open and efficient market, [the plaintiff] may . . . rely on the 'fraud-on-the-market theory' . . . ."); *Freeman v. Laventhol & Horwath*, 915 F.2d 193, 198 (6th Cir. 1990) ("[T]he presumption of reliance arising from the fraud on the market theory is only supported by common sense and probability as applied to efficient markets." (internal quotation marks and citation omitted)). Investors acknowledge that the market for GENI's shares was not efficient. Normally, that would amount to a fatal concession.

2

Investors, however, ask us to recognize a new presumption for manipulative conduct cases. Investors, they argue, typically rely on the "integrity of the market," that is, that no one has destroyed its efficiency by manipulation. This consideration justifies a presumption of reliance, according to Inves-

tors, when manipulation allegedly destroys the efficiency of the market, and with it the reliability of the market's price.

We are chary. No authority required the district court to adopt Investors' integrity of the market presumption. Indeed, the Supreme Court has adopted a rather restrictive view of private suits under § 10(b), noting that, "[t]hough it remains the law, the § 10(b) private right should not be extended beyond its present boundaries." *Stoneridge*, 128 S. Ct. at 773. In *Stoneridge*, the Court listed the *Affiliated Ute* presumption and the fraud on the market presumption as the two reliance presumptions it has recognized. *Id.* at 769. After concluding that "[n]either presumption appli[ed]," it did not inquire into any other presumption that seemed appropriate, but simply analyzed whether the plaintiffs could prove reliance directly. *Id.* These passages may not forbid the recognition of new presumptions, but they do illustrate that the district court did not have to recognize this one.

**[13]** We therefore conclude that the district court did not abuse its discretion in refusing to adopt the integrity of the market presumption. On the contrary, it permissibly declined to certify the class under Rule 23(b)(3) on the ground that individual issues pertaining to the issue of reliance predominate over common ones.

## IV

For the foregoing reasons, we AFFIRM the district court's denial of the motion for class certification. Each party shall bear its own costs on appeal.

O'SCANNLAIN, Circuit Judge, concurring:

My colleagues and I agree that the district court did not err in rejecting the integrity of the market presumption that Inves-

tors proffered in this case. I therefore join the court's opinion affirming the district court's refusal to certify the class. Unfortunately, however, we are left to conclude abruptly with a declaration of the result, for we cannot agree on the correct approach. I believe that, because the validity of a presumption of reliance in securities class actions is a matter of law and because errors of law are per se abuses of discretion, we must explicitly decide whether Investors are entitled to this novel presumption as a matter of law. I write separately to explain my view.

I

We review class certification decisions for abuse of discretion, but errors of law constitute per se abuses of discretion. *Cooter & Gell v. Hartmax Corp.*, 496 U.S. 384, 405 (1990) ("A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law."). Here, Investors squarely raised and the district court forthrightly rejected a new legal theory—the "integrity of the market" presumption. This presumption, as described by Investors, would apply in this case. Therefore, if the presumption is legally valid, then Investors are entitled to plead it. If not, then they are not.

Consider the situation in reverse: suppose the district court had adopted the integrity of the market presumption and *granted* class certification. In such case, I believe we would be bound to reverse even if existing law did not squarely foreclose such a theory because we would have to decide whether the presumption was legally valid. The same is true here. The district court held that there is no integrity of the market presumption as a matter of law. We must decide whether that legal conclusion was correct.

In short, to reach the integrity of the market presumption on its merits is not a matter of choice. We *must* decide its validity. It was raised in the district court and addressed by the dis-

trict court; it was raised and fully briefed on appeal. Where the district court "based its ruling on an erroneous view of the law," then it "necessarily abuse[d] its discretion." *Id.* I am at a loss as to how this case compels variation from this clear rule.

II

As explained, I would address the integrity of the market presumption on the merits. In my view, the presumption is legally unsupported and logically inadvisable. As presented to us, the integrity of the market presumption works in the following way. The average investor in securities typically relies on the "integrity of the market," that is, that no one has destroyed its efficiency by manipulation. This consideration justifies a presumption of reliance, according to Investors, when manipulation allegedly destroys the efficiency of the market, and with it the reliability of the market's price.

A

First, the cases from which Investors purport to have derived their theory do not support it.

Investors initially point to *Gurary v. Winehouse*, 190 F.3d 37 (2d Cir. 1999), for support. But *Gurary* did not recognize any new presumption of reliance. It merely held that, to make out a manipulation claim, a plaintiff must show that he did not know "that the price was affected by the alleged manipulation." *Id.* at 45. To be sure, the Second Circuit also noted that "[t]he gravamen of manipulation is deception of investors into believing that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators." *Id.* But this language merely summarizes the essence of a manipulation claim. It does not purport to go beyond the fraud on the market presumption.

Sticking with the Second Circuit, Investors also cite *Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374 (2d Cir. 1974).

Such case does indeed offer support, for the opinion held that "proof of transaction causation is unnecessary by virtue of the allegations as to the effectuation of a scheme to defraud which includes market manipulation." *Id.* at 381. This seems to say that there is no need to prove reliance to make out a manipulative conduct claim. But even Investors do not take that position. In any event, the Second Circuit has reversed itself on this point. *See, e.g.*, *ATSI Commc'ns*, 493 F.3d at 101 (listing reliance as an element in a manipulative conduct claim). And *In re Blech Securities Litigation*, 961 F. Supp. 569 (S.D.N.Y. 1997), another case on which they rely, reiterated the reliance element, even to make out a claim for manipulative conduct. *See id.* at 585-86. Furthermore, *Blech* applied the fraud on the market presumption without recognizing any other presumption unique to manipulative conduct cases. *Id.*

*Shores v. Sklar*, 647 F.2d 462 (5th Cir. 1981) (en banc), does not help Investors either. In *Shores*, the Fifth Circuit concluded that, although the plaintiff could not show reliance on the specific misrepresentation, he could nonetheless show reliance because he was entitled to assume that an issued security was legally issued. *See id.* at 468. As the Fifth Circuit later described the case, *Shores* embraced a presumption of reliance where alleged fraud *created the market* for a security, insofar as "actors who introduced an otherwise unmarketable security into the market by means of fraud are deemed guilty of manipulation, and a plaintiff can plead that he relied on the integrity of the market rather than on individual fraudulent disclosures." *Regents of Univ. of Calif. v. Credit Suisse First Boston (USA), Inc.*, 482 F.3d 372, 391 (5th Cir. 2007).

This "fraud created the market" theory, even were it viable, would not help Investors. They do not allege that the manipulative scheme of Deutsche Bank and others created the market for GENI's stock. GENI's shares traded publicly before the date the scheme allegedly began. Furthermore, they did not purchase the unregistered shares that the GENI insiders had

lent down the chain of broker-dealers. Thus the theory of *Shores* would not apply to this case.

### B

Beside being virtually unknown, an integrity of the market presumption is inadvisable because it would swallow the reliance requirement. Most investors do, I think it fair to say, assume that the markets are not corrupt. *Cf. Basic*, 485 U.S. at 246-47 ("It has been noted that 'it is hard to imagine that there ever is a buyer or seller who does not rely on market integrity. Who would knowingly roll the dice in a crooked crap game?' " (quoting *Schlanger v. Four-Phase Sys. Inc.*, 555 F. Supp. 535, 538 (S.D.N.Y. 1982))). But if that hypothesis sufficed to presume reliance, then no plaintiff would ever have to prove reliance. That might not worry me if this novel presumption made "the requisite causal connection," which lies at the heart of the reliance element, "between a defendant's [bad act] and a plaintiff's injury." *Basic*, 485 U.S. at 243. But Investors' integrity of the market presumption only connects the buyer or seller of securities with the market price; it does not connect the price to the defendant's manipulative conduct. Unlike the fraud on the market presumption, this theory would permit a presumption of reliance no matter how unlikely it is that the market price in question would actually reflect the alleged manipulation.

The integrity of the market presumption that Investors proffer, then, would prove too much while doing too little. Prove too much, because it would obviate the need for plaintiffs in manipulative conduct cases to prove reliance; do too little, because it does not complete the causal connection between a plaintiff's transaction in securities and a defendant's manipulation. Therefore, I would reject the invitation to recognize this new presumption of reliance.

### C

Investors make a final argument for a new presumption of reliance that deserves separate discussion. They contend that

allegations of manipulative conduct warrant distinctive treatment because the fraud on the market presumption does not apply to them.

It is true that the fraud on the market theory is normally phrased in terms of misrepresentations or omissions. *See, e.g., id.* (explaining that the fraud on the market theory "provides the requisite causal connection between a defendant's *misrepresentation* and a plaintiff's injury." (emphasis added))*; No. 84 Employer-Teamster Joint Council Pension Trust Fund*, 320 F.3d at 934 n.12 (noting that the theory creates a "rebuttable presumption of investor reliance based on the theory that investors presumably rely on the market price, which typically reflects the *misrepresentation or omission*" (emphasis added)).

But these statements do not foreclose the application of the fraud on the market theory to manipulative conduct cases. They simply reflect the relative rarity of such cases. Indeed, courts have applied the fraud on the market theory in the context of manipulation. *Peil*, 806 F.2d at 1162-63 (concluding that the fraud on the market theory pertains to claims brought under clauses (a), (b), and (c) of Rule 10b-5; *Scone Invs., L.P. v. Am. Third Market Corp.*, No. 97 CIV. 3802, 1998 WL 205338, *5 (S.D.N.Y. Apr. 28, 1998) ("The fraud on the market theory is especially applicable in the market manipulation context. Market manipulation schemes which are intended to distort the price of a security, if successful, necessarily defraud investors who purchase the security in reliance on the market's integrity.").

As a matter of logic, too, the fraud on the market theory is not limited to cases of misrepresentation and omission. Recall that it is "based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business." *Basic*, 485 U.S. at 241 (internal quotation marks omitted). The artificial market activity

that constitutes manipulative conduct, no less than misrepresentations of, or misleadingly incomplete statements about, a company's earnings, is also information that the market price either does or does not reflect. The fraud on the market theory is one way courts can presume such a reflection, but Investors have chosen not to rely on it.[1] They have also chosen not to argue for direct reliance. In other words, Investors have abandoned two well-worn paths to relief. There is no reason, then, to blaze a third, for the law does not let market manipulators off the hook.

## III

In summary, it seems to me we must reach the validity of the integrity of the market presumption, for it is at the heart of the legal error Investors claim the district court made in the class certification ruling. I therefore concur in the court's opinion so far as it goes, but write separately to address the legal issue that, in my view, drives this appeal. Doing so, I would conclude that the integrity of the market presumption Investors proffered is not legally valid, so the district court did not err in refusing to recognize it. Thus, where a putative class alleges manipulative conduct as a violation of § 10(b), it must either prove reliance directly or invoke its presumption pursuant to the fraud on the market theory.

---

[1]I recognize the possibility that certain allegations of manipulative conduct might change the application of the fraud on the market theory. This is because the plaintiff in manipulation cases often alleges that a defendant directly manipulated the price. Certainly, a plaintiff must still show that the market in question could absorb into the price the misinformation communicated by the alleged manipulation. But need a plaintiff show the same type of proof of an efficient market in a manipulation case as is required in a misrepresentation case? Although I note the doctrinal wrinkle, this is a question I would agree we actually do not need to reach, because Investors forsook the fraud on the market theory.

GRABER, Circuit Judge, concurring:

I concur fully in the court's opinion but write to respond to Judge O'Scannlain's assertion that we must decide definitively, one way or the other, whether Investors are entitled to plead a novel "integrity of the market" presumption. Concurrence at 9920-21. Neither logic nor precedent requires us to reach that question in the circumstances presented here.

The district court denied class certification because individual questions, rather than class-wide questions, predominated within the meaning of Rule 23(b). The court reached that conclusion by analyzing the two existing exceptions to the requirement to prove individual reliance and by declining to recognize a third proposed exception. We review for abuse of discretion, *Dunleavy v. Nadler (In re Mego Fin. Corp. Sec. Litig.)*, 213 F.3d 454, 461 (9th Cir. 2000), so the only question we must answer is whether the district court's refusal to recognize a new exception amounted to an abuse of discretion. The district court did not abuse its discretion even if the third exception turns out to be valid, so long as existing law did not compel the court to recognize the third exception in this case.

The presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153-54 (1972), does not apply because it is limited to cases that "can be characterized as . . . primarily alleg[ing] omissions." *Binder v. Gillespie*, 184 F.3d 1059, 1064 (9th Cir. 1999). The complaint primarily alleges acts (manipulation) rather than omissions. The fraud-on-the-market presumption does not apply because it establishes reliance "when the statements at issue become public" and the "public information is reflected in the market price of the security." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 128 S. Ct. 761, 769 (2008). As Investors acknowledge in their bid to create a new exception, those conditions do not exist here.

The reason why the new exception is not compelled by existing law can be found quite simply in the Supreme Court's cautionary statement that "the § 10(b) private right should not be extended beyond its present boundaries." *Id.* at 773. We need say no more than that to hold that the district court permissibly denied class certification.

To summarize, the district court declined as a matter of law to recognize a new version of the fraud-on-the market presumption, which we refer to as an "integrity of the market" presumption. All we have to decide is whether the district court *had* to recognize that new theory. If so, then the court made a mistake of law (and hence abused its discretion, *see Koon v. United States*, 518 U.S. 81, 100 (1996) ("A district court by definition abuses its discretion when it makes an error of law.")). But if the court did not have to recognize the investors' proposed new theory, there is no abuse of discretion; that result could occur *either* because there is no such theory as a matter of law *or* because it is unclear whether such a theory ought to be recognized or not. We properly have opted for the final formulation and have found no abuse of discretion.