Lindsey **WEBB**, et al., Plaintiffs,

v.

**CARTER'S INC.**, et al., Defendants.

No. CV 08–7367 GAF (MANx).

United States District Court,
C.D. California.

Feb. 3, 2011.

Alan M. Mansfield, The Consumer Law Group, John A. Lowther, IV, Doyle Lowther LLP, San Diego, CA, Christopher D. Jennings, William T. Crowder, Scott E. Poynter, Emerson Poynter LLP, Little Rock, AR, Edith M. Kallas, Joe R. Whatley, Jr., Ilze C. Thielmann, Patrick J. Sheehan, Whatley Drake & Kallas LLC, New York, NY, J. Gerard Stranch, IV, James G. Stranch, III, Michael G. Stewart, Steven J. Simerlein, Branstetter Stranch & Jennings PLLC, Nashville, TN, John G. Emerson, Emerson Poynter LLP, Houston, TX, Robert A. Jigar-

jian, Jigarjian Law Office, San Anselmo, CA, Thomas D. Mauriello, Mauriello Law Firm, San Clemente, CA, for Plaintiffs.

David S. Osterman, Anita R. Hotchkiss, Steven S. Vahidi, Goldberg Segalla LLP, Princeton, NJ, Eric Y. Kizirian, Roy M. Brisbois, Lewis Brisbois Bisgaard and Smith LLP, David S. Poole, Poole & Shaffery LLP, Los Angeles, CA, Beth O'Neal Arnese, Steven M. Selna, Stella Fey Epling, Drinker Biddle & Reath LLP, San Francisco, CA, for Defendants.

## ORDER RE: PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

GARY ALLEN FEESS, District Judge.

### I. INTRODUCTION

Plaintiffs Lindsey Webb, Anastasia Booth, Kina Abrams, Jayme Sanchez, Amy Muir, and Nancy Muir (collectively, "Plaintiffs") bring this putative nationwide class action lawsuit against defendants Carter's, Inc. ("Carter's"); Avery Dennison, Inc. ("Avery"); Pacific Concept Industries (USA), LLC ("PCI USA"); and Pacific Concepts Industries Limited ("PCI Hong Kong").[1] (Docket No. 144, Fourth Amended Complaint ("FAC").) This suit arises out of an alleged failure to disclose and provide adequate warnings that various infant and children's tagless clothing that Defendants designed, manufactured, distributed, and sold to the public had failed tests which showed that the tags contained toxic chemicals that could cause adverse skin reactions. (*Id.* ¶ 1.) Plaintiffs bring claims for unfair and fraudulent business practices in violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof.Code § 17200 *et seq.;* for breach of implied warranties; for breach of the Magnuson–Moss Act; for violation of the California Consumers Legal Remedies Act ("CLRA"), Cal. Civ.Code § 1750 *et seq.;* for misleading and untrue advertising in viola-

tion of California's Fair Advertising Law ("FAL"), Cal. Bus. & Prof.Code § 17500 *et seq.;* and for fraudulent concealment. (FAC ¶¶ 244–325.)

Presently before the Court is Plaintiffs' Motion for Class Certification. (Docket No. 172.) For the reasons set forth below, the Court **DENIES** the motion.

### II. FACTS

#### A. PLAINTIFFS' ALLEGATIONS

##### 1. BACKGROUND FACTS

Carter's makes children's clothing, which it sells through its own retail stores and through major retailers like Target. (FAC ¶ 3.) Beginning in 2006, Carter's began using a "tagless" label, which is a heat-transferred, ink-based image that is permanently transferred onto fabric. (Docket No. 246, Amended Declaration of Steven J. Simerlein ("Am. Simerlein Decl."), Ex. 3 [Deposition of James ("Eidson Depo.")] at 33:3–17, 37:24–38:20.) Carter's designs its labels and uses other companies to supply them. (*Id.* at 89:20–25.) It relied on Avery, PCI USA and PCI Hong Kong, and non-party Inter–Trend Global Packaging Co. to provide the 110 million labels it used for its Fall 2007 line. (*Id.* at 268:8–15.) Of these, Avery produced about 90 percent. (*Id.*)

Carter's began production of its Fall 2007 line in December 2006, and the garments became available in stores beginning in May 2007. (Am. Simerlein Decl., Ex. 5 at ESI–121412; FAC, Ex. F at 18.) The tagless labels in the Fall 2007 line were a large, multi-colored, solid block of ink, instead of a smaller, single-color stenciled design of the type previously used.

According to Carter's, each label vendor uses its own proprietary ink formulation, printing methods, and label backing material.[2] (Docket No. 195, Declaration of James Eidson ("Eidson Decl.") ¶ 6.) This means

---

1. On November 23, 2010, the Court quashed service on PCI Hong Kong and ordered Plaintiffs to properly serve that defendant if they wish to proceed with claims against it. (Docket No. 228, 11/23/10 Order.)

2. Plaintiffs object to this evidence. (Docket No. 217–1.) Because the Court does not rely on this evidence in deciding the merits of the motion for class certification, the objection is **OVERRULED.** Accordingly, Carter's ex parte application for leave to file a response to Plaintiffs' objections (Docket No. 235) is also **DENIED.**

that, for the Fall 2007 line, "there are thousands of possible combinations of garment style, production facility, label manufacturer, and manufacturing process." (Carter's Opp. at 5.)

## 2. CLAIMED VIOLATIONS

Plaintiffs allege that they purchased infant clothing from Carter's Fall 2007 line that contained heat-transferred tagless labels made by Avery, PCI USA, and PCI Hong Kong. (FAC ¶ 6.) Plaintiffs claim that the labels contain excessive quantities of chemicals that pose a risk to children's skin, and that Defendants knew about the chemicals and their risks but did not inform the public. They further allege that these tagless labels contained chemicals that caused their infant children to suffer skin irritations of varying degrees. (*Id.* ¶¶ 47–49, 52–54, 59–60, 67–68, 76, 79.) For instance, the label caused a sore between the shoulder blades of Webb's and Sanchez's children, which made it hard for them to sleep on their backs, the position recommended to avoid Sudden Infant Death Syndrome. (*Id.* ¶¶ 47–48, 52–53.) Sanchez's child developed pus-filled sores that would burst and scab over. (*Id.* ¶ 54.)

### a. Testing and Chemicals Present in Labels

Plaintiffs claim that neither Carter's nor Avery ensured that the Fall 2007 tagless design was safe for use in children's clothing, and that Carter's did not ensure that its tagless labels met its own internal standards for acceptable chemical levels.

Plaintiffs also put forth evidence that Carter's knew about the presence of toxic chemicals before consumers started to complain. In February 2007, Carter's received a test report from Inter–Trend showing that the labels contained 0.11 percent phthalates, 0.01 percent more than allowable under Carter's internal standards. (Am. Simerlein Decl., Ex. 21, 23.) A Carter's representative accepted this test as "a PASS" and notified the vendor that the phthalates test would be required in the future only for parts children

could place in their mouths. (Am. Simerlein Decl., Ex. 23.) In addition, Avery provided Carter's with test results before July 31, 2007, showing that the tagless labels it produced for the Fall 2007 product line contained DEHP. (Am. Simerlein Decl., Ex. 7, at 5.)

Plaintiffs also allege that Avery knew about the ink's toxicity. In March 2007, Avery received a report from Intertek that the ink in the labels contained 13 percent DEHP, 14 percent PVC, and 2 percent epoxy resin by weight. (Am. Simerlein Decl., Conf. Ex. 1 at 2.) This report, however, noted that, in the quantities present on the labels, "no data ... indicate that the ingredients ... would be expected to cause significant acute or chronic toxicity via dermal contact." (*Id.*)

Avery also had a U.S. Department of Labor Material Safety Data Sheet (MSDS) that indicated that the ink used in the tagless labels could cause "irritation, defatting, or dermatitis." (Am. Simerlein Decl., Ex. 34 at AD–105–06; Ex. 8 [Deposition of Forrest Kelly Browning] at 40:10–41:18.) In January 2007, Avery also received a report showing that the Carter's heat-transferred labels contained 23.6 ppb of formaldehyde. (Am. Simerlein Decl., Ex. 35.) According to Plaintiffs, this exceeded Avery's standard of 20 ppb for children under 36 months. (Mem. at 8.)

### b. Consumer Complaints and Carter's Response

By early November 2007, Carter's had received complaints about the tagless labels. (FAC, Ex. F at 17–18.) In response, Carter's took a number of steps. Carter's quickly redesigned the labels to include less ink. (Am. Simerlein Decl., Ex. 51 [email exchange] at 3.) Carter's also reviewed the earlier testing of the labels, and confirmed that they all had passed. (*Id.* at 117:23–118:15.) It also did new tests on returned garments to see what could have caused the skin problems. (Am. Simerlein Decl., Ex. 50 at 1–2.)[3] Cater's also hired temporary workers to process returns of garments with the tagless labels, and those workers re-

3. Carter's reviewed its vendor records and confirmed that Avery had produced most of the labels, but further confirmed that PCI had manu-

factured some of the labels in returned garments. (*Id.* at 119:4–9; Am. Simerlein Decl., Ex. 55.)

mained until March 2010, by which time returns had abated. (Am. Simerlein Decl., Ex. 43 [Deposition of Mary J. Wiedenhaft] at 99:5–11, 101:6–11.) Carter's estimates that it received 3400 consumer complaints as of January 2010. (Am. Simerlein Decl., Ex. 3 [Eidson Depo.] at 185:5–13, 191:24–25.) As of October 1, 2010, 9,828 consumers had returned 158,128 garments. (Cleveland Decl. ¶ 8.)

### c. The NAMSA Tests

In December 2007, Avery requested North American Science Associates, Inc. ("NAMSA") to conduct cytotoxicity tests on three tagless label samples. (Am. Simerlein Decl., Ex. 57.) A sample article failed one of these tests, as it "showed evidence of causing moderate cell lysis or toxicity." (*Id.* at NAMSA 60.) An Avery scientist that received the failed NAMSA test, Dong T–Tsai Hsieh, concluded that the test sample was "contaminated somehow" because it differed from other test results. (Am. Simerlein Decl., Ex. 32 [Hsieh Deposition] at 52:4–22.) NAMSA reported that the test system was not responsible for the test failure and noted that "[c]lient acknowledged results. Client did not request a replacement test."[4] (Am. Simerlein Decl., Ex. 60 at NAMSA 431.) Avery, however, claims that it ordered a re-test, which showed no evidence of cell lysis or toxicity. (Avery Opp. at 4.) Hsieh stated in a declaration that he received a re-test of "sample article 110–503," but his declaration is unclear as to whether the specific item or just "identical tagless samples from the same batch" were retested. (Docket No. 134, Hsieh Decl. ¶¶ 6–7.) Carter's claims it did not find out about the failed NAMSA test until discovery. (Carter's Opp. at 9 n. 2.) In any event, no defendant ever publicly disclosed the failed NAMSA test. Later testing by Amec Geometric relied on an Intertek report and NAMSA's testing, but not the failed test. (Am. Simerlein Decl., Ex. 61 at AD 409, 411.)

In March 2008, Carter's requested vendor confirmation that "all products produced for Carter's comply with the acceptable limits set by Carter's for products containing PVC and phthalates," i.e. no greater than "0.1% by mass." (Am. Simerlein Decl., Ex. 63.) Avery responded that its labels contain 15 percent PVC and 14 percent phthalate by weight. (Am. Simerlein Decl., Conf. Ex. 5.)

In early summer 2008, Carter's Director of Consumer Affairs, Janell Cleveland, suggested putting something on the company's website about the tagless labels, but VP of Quality Jim Eidson responded that he "did not feel there was a need to do that." (Am. Simerlein Decl., Ex. 64 [Deposition of Janell Cleveland] at 60:19–62:7.)

### d. CPSC Involvement

In late winter or early spring 2008, Carter's Director of Quality Assurance, Eric Tarnow, provided the Consumer Product Safety Commission (CPSC) with sample garments. (Am. Simerlein Decl., Ex. 65 [Deposition of Eric Tarnow] at 70:18–71:25.) In September 2008, the CPSC, which had received some consumer complaints about the Fall 2007 line, indicated it wanted to issue a statement warning the public about the tagless labels. (*Id.* at 89:14–23.) Later that month, Carter's provided the CPSC a full report on the tagless labels. (Am. Simerlein Decl., Ex. 66.) By then, approximately 100.75 million garments from the Fall 2007 line were in the hands of consumers. (*Id.* at CAR 3212.) The report indicated that the tagless labels were supplied by Avery only, reported that "[a] small percentage of consumers have reported that young infants developed localized rashes," and noted that the label was discontinued "[f]or design reasons." (*Id.* at CAR 3205, 3207, 3209.) At that time, Carter's reported it had received 259 reports of rashes, which represented 2.4 reports for every 1 million products shipped. (*Id.* at CAR 3209.) Two days after receiving the report, the CPSC asked Carter's to provide the test reports and consumer complaints. (Am. Simerlein Decl., Ex. 69.)

---

**4.** On December 9, Avery filed an objection to this evidence as hearsay and lacking foundation. (Docket No. 239.) Because the actual truth of whether Avery ordered a re-test is relevant to the merits, and not to the class certification question presently before the Court, the objection is **OVERRULED** for purposes of this motion.

### e. Public Statements

On October 23, 2008, Carter's and CPSC issued a joint public statement about the tagless labels. (Am. Simerlein Decl., Ex. 54 [Interrogatory Responses], Ex. A [Summary of Carter's Public Statements].) The statement indicated that some babies had developed rashes after wearing clothes with the tagless labels, but did not specify the chemicals contained in the labels. (Id.) After release of the statement, reports of injuries from consumers "greatly increased." (Am. Simerlein Decl., Ex. 65 [Harnow Depo.] at 116:7–10.)

In November 2008, Carter's CEO, Michael Casey, gave an interview to the ZRecommends website. (FAC, Ex. F.) In this interview, he indicated that Carter's had redesigned the labels for "aesthetic" reasons.[5] (Id. at 18.) He also indicated that the company had tested samples and found "nothing in that label . . . that could cause that kind of irritation." (Id. at 19.) Thus, they concluded it was a "rare allergic reaction in some babies with highly sensitive skin." (Id.) He also indicated that Carter's had shown photos of the rashes to "physicians," [6] the first of which had concluded it was contact dermatitis. (Id.) The same article reported Cleveland, of Carter's Consumer Affairs department, as stating that the standard labels did not exceed limits for Azo dyes, heavy metals or lead, and "never contained formaldehyde." (Id. at 18.)

In October and November 2008, Carter's also had a statement on its website that it had received some reports of allergic reactions to the tagless labels. (Am. Simerlein Decl., Ex. 54, Ex. A.) The statement indicated that the company had reviewed the products and test results and concluded that the labels did not contain "any known skin irritants or abrasive chemicals, or that such a rash is anything beyond a rare allergic reaction to an otherwise safe product." (Id.) The statement advised consumers they could

return any product they were not satisfied with for a full refund. (Id.)

Shortly after the CPSC statement came out, Avery released a statement acknowledging the report and noting that Carter's had received complaints of fewer than four rashes per 1 million garments sold. (Am. Simerlein Decl., Ex. 72.) The statement did not disclose any chemicals used in the labels, or the fact that phthalates "have been implicated in some reproductive abnormalities in rats," as one of Avery's technical directors had reported internally a few weeks before the statement was issued. (Id.; Am. Simerlein Decl., Ex. 30 at AD 55301.)

### f. Refund Policy

Carter's allows dissatisfied consumers to return products for a refund. Typically, Carter's provides full refunds to consumers with receipts, or a refund at the lowest price the item was sold for when a consumer does not have a receipt. (Declaration of Brian R. Tinkham, Ex. B. [Deposition of Michael Casey ("Casey Depo.")] at 147:1–10.) They changed the policy, however, for families concerned about the tagless labels. (Id. at 147:6–10.) For garments from the Fall 2007 line, consumers without proof of purchase who report a skin reaction get a refund at the full Manufacturer's Suggested Retail Price. (Docket No. 196, Declaration of Janell Cleveland ("Cleveland Decl.") ¶ 5.) These consumers also get an additional gift, usually a teddy bear, and reimbursement for out-of-pocket medical costs. (Id. ¶¶ 5, 7.) Carter's requires documentation only if those costs exceed $250. (Id. ¶ 7.) Consumers without receipts who do not report a skin reaction can get a refund at the highest price charged in Carter's own outlet stores. (Id. ¶ 5.) This policy was apparently in place before this lawsuit was filed. (Casey Depo. at 149:17–150:4.)

As of October 1, 2010, 9,828 consumers obtained refunds pursuant to this policy. (Cleveland Decl. ¶ 8.) Of these, 3,400 report-

---

5. Plaintiffs contend that this was misleading because they actually changed the labels because of the rashes. (Mem. at 16.) However, the evidence indicates that Carter's did change the labels for aesthetic reasons, but then made additional modifications to minimize the risk of skin

reactions. (See Am. Simerlein Decl., Ex. 53 [Deposition of Michael Casey] at 82:2–20.)

6. Plaintiffs object that Carter's only informally contacted one doctor, Dr. Strum. (Mem. at 17.)

ed skin problems. (*Id.*) In all, consumers returned 158,128 tagless garments. (*Id.*)

## B. THE PROPOSED CLASSES

Plaintiffs identify three classes in their motion for class certification. (Mem. at 2.) First, they bring claims under the UCL and CLRA against Avery[7] on behalf of "all persons in the United States who purchased and/or acquired Carter's infant apparel products with tagless labels made for the Fall 2007 line." (*Id.*) They denominate this class "the Nationwide Class." (*Id.*) Second, they bring claims under the UCL and CLRA against Carter's, PCI USA, and PCI Hong Kong, FAL claims against Carter's[8], and fraud claims against all defendants on behalf of "all persons in California who purchased and/or acquired Carter's infant apparel products containing tagless labels made for the Fall 2007 line." (*Id.*) They denominate this class "the California Class." (*Id.*) Finally, Plaintiff Webb also brings a claim for breach of California's implied warranty of merchantability against Carter's on behalf of herself and a subclass of "all persons within the California Class who purchased garments from the Fall 2007 line from a Carter's outlet and/or Carter's retail store." (*Id.*) They denominate this class "the California Sub-Class." (*Id.*)

## III. DISCUSSION

### A. STANDING

 Before considering whether Plaintiffs' proposed classes meet the requirements of Federal Rule of Civil Procedure 23, the Court must determine whether the members of the proposed class have Article III standing. Although there is no controlling authority requiring absent class members, as opposed to the named plaintiffs, to satisfy Article III's standing requirements, the Court is persuaded by authority indicating that they must. In *Burdick v. Union Security Insurance Co.*, Judge Collins concluded

that absent class members, like the class representatives, must have standing. *Burdick v. Union Sec. Ins. Co.*, 2009 WL 4798873, *3 (C.D.Cal. Dec. 9, 2009). In reaching this conclusion, Judge Collins pointed to the Supreme Court's decision in *Reno v. Catholic Social Services, Inc.*, 509 U.S. 43, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993), which allows the federal courts to exercise jurisdiction over the claims of class members only if those claims are ripe. *Id.* at *3. Judge Collins also pointed to other cases indicating that classes should be defined so as to exclude members lacking standing. *Id.* at *4 (citing *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir.2006); *O'Neill v. Gourmet Sys. of Minn., Inc.*, 219 F.R.D. 445, 451–52 (W.D.Wis.2002); *Sanders v. Apple, Inc.*, 672 F.Supp.2d 978, 990–91 (N.D.Cal. 2009)). Finally, Judge Collins noted that requiring class members to have standing comports with the Supreme Court's admonition to be "mindful that Rule 23's requirements must be interpreted in keeping with Article III constraints." *Id.* (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 612–13, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)).

The Court acknowledges that a leading treatise, Newberg on Class Actions, indicates that absent class members need not make a showing of standing. Newberg on Class Actions § 2:7. This treatise, however, also suggests that members of a proper class will necessarily have standing, because the class representative's claims must be "typical" of those of the class.

Further, contrary to Plaintiffs' contention, the California Supreme Court's decision in *In re Tobacco II*, 46 Cal.4th 298, 93 Cal.Rptr.3d 559, 207 P.3d 20 (2009), does not establish that absent class members in a federal class action need not have Article III standing. In that case, the California Supreme Court considered the effect of Proposition 64, a voter initiative that amended the UCL to allow private suit only by a plaintiff "who has

---

7. In their motion, Plaintiffs claim that they also assert an FAL claim against Avery. (Mem. at 2.) The Fourth Amended Complaint, however, asserts an FAL claim only against Carter's. (FAC ¶¶ 293–302.)

8. In their motion, Plaintiffs also claim to assert an FAL claim against PCI USA and PCI Hong Kong. (Mem. at 2.) The Fourth Amended Complaint, however, asserts an FAL Claim only against Carter's. (FAC ¶¶ 293–302.)

suffered injury in fact and has lost money or property as a result of ... unfair competition." *Id.*, 93 Cal.Rptr.3d 559, 207 P.3d at 25. Previously, the UCL had allowed suit by any private party. The court considered whether that new requirement applied only to the named plaintiff or also to all absent class members. *Id.*, 93 Cal.Rptr.3d 559, 207 P.3d at 25. The court concluded, based on the language of the initiative, that only the named plaintiff needed to show such an injury in fact. *Id.* Individuals could remain part of the class even if they had suffered no injury in fact. *Id.*, 93 Cal.Rptr.3d 559, 207 P.3d at 35. That case, however, was in state court and did not address federal courts' standing requirements. Before the enactment of Proposition 64, uninjured plaintiffs could bring UCL claims in state court, but not federal court. *See, e.g., Seibels Bruce Group, Inc. v. R.J. Reynolds Tobacco Co.*, No. C–99–0593 MHP, 1999 WL 760527 at *6 (N.D.Cal. Sept. 21, 1999) (holding that plaintiff did not have standing to assert UCL claim in federal court because it did not establish a distinct and palpable injury); *Boyle v. MTV Networks, Inc.*, 766 F.Supp. 809, 817–18 (N.D.Cal.1991) (noting that case involving private-party UCL claim could not be removed as it would result in lack of standing). *Tobacco II* established that Proposition 64 changes this for named plaintiffs, but not for absent class members. It did not, and could not, hold that uninjured parties could be class members in a class action brought in *federal* court, despite their lack of Article III standing. *Tobacco II* therefore does not persuade the Court that a class action can proceed even where class members lack Article III standing.

■ Plaintiffs respond that the proposed class should nonetheless be certified because all class members have standing. To have standing, a plaintiff must have suffered a concrete and particularized, actual or imminent "injury in fact"; there must be a causal connection between the injury and the complained-of conduct; and it must be likely that a favorable decision will redress the injury. *Renee v. Duncan*, 623 F.3d 787, 796–97 (9th

Cir.2010) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)) (internal quotations omitted). Plaintiffs contend that all members of the proposed classes—consisting of people who "purchased and/or acquired" the clothes, even if their children suffered no adverse reaction—have suffered the "injury in fact" of having "paid good money for garments that were defective and not fit for market by Carter's and Avery's own standards." (Reply at 17.) The Court is not persuaded.

■ At the outset, those class members who "acquired," rather than "purchased," the garments plainly did not suffer any injury from "pa[ying] good money" for defective goods. Further, even those class members who did spend money on the garments did not suffer a cognizable injury supporting standing. Plaintiffs' claim of injury rests on their theory that purchasers lost the benefit of their bargain because they parted with money for a defective product. That argument fails in the present context. As noted above, the overwhelming majority of children who wore the garments suffered no adverse effects and Plaintiffs have failed to show that the levels of chemicals in the clothes exceeded standards established by law.[9]

The cases Plaintiffs rely on in support of their "paid good money" argument are readily distinguishable. Plaintiffs cite to *Wolin v. Jaguar Land Rover North America LLC*, 617 F.3d 1168 (9th Cir.2010), which reversed the denial of class certification for a class comprised of all people who had bought a vehicle with an alignment geometry defect that caused premature tire wear, regardless of whether their tires had not yet worn prematurely. *Id.* at 1170–71. The defect was such, however, that the injury was inevitable and would require earlier than normal tire replacement. But that was not the point of the decision. Rather, in its decision to reverse the denial of class certification, the court focused only on commonality, predominance, typicality, and superiority, and did not

9. The Court notes that Plaintiffs present evidence that the clothing did not meet Carter's own standards, but in the present context, that is not sufficient to establish a cognizable defect that deprived the purchasers of the benefit of their bargain as discussed further in the text.

address the standing of absent class members at all. This case therefore provides no support for Plaintiffs' standing argument.

Plaintiffs also rely on *Cole v. General Motors Corp.*, in which the Fifth Circuit held that the loss of value of, or overpayment for, a defective good amounted to an economic loss supporting standing. *Cole v. Gen. Motors Corp.*, 484 F.3d 717, 722 (5th Cir.2007). There, the court held that plaintiffs had standing where they sought to recover for purchasing cars with defective side airbag sensors, even though plaintiffs' side airbags had never actually inadvertently deployed. *Id.* Because the products were defective at the time of sale, those plaintiffs alleged a cognizable injury in overpayment, loss in value, or loss of usefulness. *Id.* at 723. Unlike in that case, however, the alleged defect here does not affect all consumers. Rather, for babies without sensitive skin, the families have enjoyed the full benefit of the clothes and do not face a constant risk that the defect might cause some harm.

An alleged defect that, like the alleged defect here, did not present a constant risk of harm was found not to amount to an injury supporting standing in a recent Ninth Circuit case, *Birdsong v. Apple, Inc.*, 590 F.3d 955, 961 (9th Cir.2009). In *Birdsong*, the Ninth Circuit held that plaintiffs who bought iPods that allegedly had an inherent risk of causing hearing loss did not suffer an economic harm. *Birdsong v. Apple, Inc.*, 590 F.3d 955, 961 (9th Cir.2009). There, the plaintiffs claimed that the defect caused their iPods to be worth less than they paid for them. *Id.* The court concluded that this claimed defect did not amount to a loss of money or property under the UCL because it was not a "cognizable defect"; it rested on a merely hypothetical risk of hearing loss to other consumers who might use their iPods at high volumes, and the safety benefit was not part of the bargain in the first place. *Id.*

Relying in part on *Birdsong*, Judge Wilken concluded that plaintiffs bringing UCL claims against the maker of frozen pot pies that were potentially contaminated had no standing. *Meaunrit v. The Pinnacle Foods Grp., LLC*, 2010 WL 1838715, at *1 (N.D.Cal. May 5, 2010). Judge Wilken concluded that,

as in *Birdsong*, the plaintiffs' injuries were merely hypothetical, as they did not allege that the frozen foods were actually contaminated. The economic injury—paying for pot pies that the plaintiffs then discarded—was caused not by the defendant, but by the plaintiffs' own decision to discard the pies. *Id.* at *3. Judge Wilken distinguished a case where a plaintiff had bought a defective stroller that presented an imminent or unmitigable risk of harm, concluding that the plaintiffs in her case did not allege that the defendant's products were actually dangerous. *Id.* at *3. Similarly, here, Plaintiffs have not alleged that the clothing is actually dangerous for those babies who have suffered no adverse reaction. Where the babies have not reacted, they do not likely face any imminent risk of harm. And where they have been able to use the clothes without incident, the purchasers have not suffered any economic loss.

 Plaintiffs fare no better with their claim against Carter's for breach of the implied warranty of merchantability on behalf of the California sub-class. Under California law, any contract for the sale of goods includes an implied warranty that the goods are merchantable, that is, that they would "[p]ass without objection in the trade." Cal. Comm.Code § 2314. Where a product is not "of the same quality as those generally acceptable in the trade," the implied warranty is breached. *See* CACI No. 1231. To make out a claim, however, a plaintiff must also show that she was harmed, and that the failure of the product to have the expected quality was a substantial factor in causing that harm. *See Andrade v. Pangborn Corp.*, No. 02–3771, 2004 WL 2480708, at *23 (N.D.Cal. Oct. 22, 2004) (citing CACI No. 1231). Contrary to Plaintiffs' suggestion, the buyer does not suffer an injury from the defect itself, and his injury is not properly characterized as the deprivation of his right to take a product free from defect. Rather, a plaintiff can recover for breach of an implied warranty only if the product "contains an inherent defect which is substantially certain to result in malfunction during the useful life of the product." *Hicks v. Kaufman & Broad Home Corp.*, 89 Cal.App.4th 908, 107

Cal.Rptr.2d 761, 768 (2001). Here, plaintiffs have not shown that the product is "substantially certain" to result in skin irritation. To the contrary, the evidence shows that only a very small percentage of children experienced any negative reaction to the tagless labels. Plaintiffs therefore cannot show that the proposed class members suffered an injury that would allow them to press a claim for breach of the implied warranty of merchantability. They therefore have not shown that those class members suffered a cognizable injury sufficient to give them Article III standing.

For these reasons, the Court concludes that the members of the proposed classes lack standing. On this basis alone, the Court must deny the motion for class certification.

### B. RULE 23'S REQUIREMENTS

Even if the members of the proposed classes did have Article III standing, the Court would deny class certification because the classes do not meet the requirements for certification under Federal Rule of Civil Procedure 23.

### 1. STANDARD FOR CLASS CERTIFICATION

■ "Class actions have two primary purposes: (1) to accomplish judicial economy by avoiding multiple suits, and (2) to protect the rights of persons who might not be able to present claims on an individual basis." *Haley v. Medtronic, Inc.*, 169 F.R.D. 643, 647 (C.D.Cal.1996) (citing *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983)).

The Federal Rules of Civil Procedure authorize class action litigation where Rule 23's requirements are met. Federal Rule of Civil Procedure 23(a) provides that:

> One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
>
> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). To certify a class action, plaintiffs must first show that the elements of Rule 23(a) have been met. *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 462 (9th Cir.2000). If the district court finds that the action meets the prerequisites of Rule 23(a), the court must then consider whether the class is maintainable under Rule 23(b). *Id.*

Plaintiffs seek certification under Rule 23(b)(2) and 23(b)(3). Rule 23(b)(2) allows a class action where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed.R.Civ.P. 23(b)(2).

■ Rule 23(b)(3) allows a class action where "the court finds [ (1) ] that the questions of law or fact common to class members predominate over any questions affecting only individual members, and [ (2) ] that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3). "The Rule 23(b)(3) predominance inquiry tests whether the proposed classes are sufficiently cohesive to warrant adjudication by representation." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir.1998) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)). The predominance inquiry measures the relative weight of the common and individualized issues. *Id.* "Implicit in the satisfaction of the predominance test is the notion that the adjudication of common issues will help achieve judicial economy." *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1189 (9th Cir.2001) (quoting *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir.1996)).

In assessing superiority of class adjudication, a court should consider:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Fed.R.Civ.P. 23(b)(3). "If the main issues in a case require the separate adjudication of each class member's individual claim or defense, a Rule 23(b)(3) action would be inappropriate." *Zinser*, 253 F.3d at 1189 (citing 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* (hereinafter "Wright & Miller") § 1778 (2d ed.1986)).

### 2. APPLICATION OF RULE 23 REQUIREMENTS

■ The Court is not concerned about Plaintiffs' satisfaction of Rule 23(a)'s requirements of numerosity, commonality, typicality, and adequacy of representation. Plaintiffs, however, have not satisfied Rule 23(b)(3)'s requirements that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members" and that "a class action [be] superior to other available methods for fair and efficient adjudication of the controversy." [10] *See* Fed.R.Civ.P. 23(b)(3).

#### a. *Predominance of Common Issues*

"Implicit in the satisfaction of the predominance test is the notion that the adjudication of common issues will help achieve judicial economy." *See Valentino*, 97 F.3d at 1234. Thus, the Court must determine whether common issues constitute such a significant aspect of the action that "there is a clear justification for handling the dispute on a representative rather than on an individual basis." Wright & Miller § 1778. For the proponent to satisfy the predominance inquiry, it is not enough to establish that common questions of law or fact exist, as it is under Rule 23(a)(2)'s commonality requirement—

the predominance inquiry under Rule 23(b) is more rigorous. *Windsor*, 521 U.S. at 624, 117 S.Ct. 2231. The predominance question "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Id.* at 623, 117 S.Ct. 2231. The Court, therefore, must balance concerns regarding the litigation of issues common to the class as a whole with questions affecting individual class members. *In re Northern District of California, Dalkon Shield IUD Prods. Liab. Litig.*, 693 F.2d 847, 856 (9th Cir.1982).

The Court concludes that individualized issues predominate with respect to each claim for relief asserted in this lawsuit.

#### 1. CLRA Claims

■ To make out a CLRA violation, a plaintiff must show that the defendant committed one of 23 enumerated unlawful practices, including "representing that goods ... have ... characteristics, ... uses, [or] benefits ... that they do not have," and "representing that goods ... are of a particular standard, quality, or grade ... if they are of another." Cal. Civ.Code § 1770(a). A plaintiff can only recover, however, if he suffers damage "as a result of" conduct forbidden by the statute. *Id.* § 1780(a). Thus, under the CLRA, a plaintiff must show that a "defendant's deception caused them harm." *Mass. Mutual Life Ins. Co. v. Superior Court*, 97 Cal.App.4th 1282, 119 Cal.Rptr.2d 190, 197 (2002).

Establishing the first element—that the defendants engaged in conduct prohibited by the statute—is plainly susceptible to common proof, as it focuses on the defendants' actions.

■ The parties disagree, however, about whether establishing causation is susceptible to class-wide proof. The CLRA causation element does not necessarily make a claim unsuitable for class treatment. *See Mass. Mutual Life Ins.*, 119 Cal.Rptr.2d at 197. "Causation as to each class member is commonly proved more likely than not by

---

**10.** In the alternative, Plaintiffs also seek certification under Federal Rule of Civil Procedure 23(b)(2), which allows class actions for claims for injunctive relief. The Court does not separately address the propriety of certification under Rule 23(b)(2) because, as discussed above, class certification must be denied for lack of standing.

materiality." *Id.* (quoting *Blackie v. Barrack,* 524 F.2d 891, 907 n. 22 (9th Cir.1975)). Thus, where material misrepresentations are made, "at least an inference of reliance would arise as to the entire class." *Id.* (quoting *Vasquez v. Superior Court,* 4 Cal.3d 800, 94 Cal.Rptr. 796, 484 P.2d 964 (1971)). However, where individual issues as to materiality predominate, the record will not permit such an inference. *Id.*

■■■■■ Here, the parties dispute whether the alleged omissions were actually material, and whether that dispute is susceptible to common proof. "A misrepresentation of fact is material if it induced the plaintiff to alter his position to his detriment. Stated in terms of reliance, materiality means that without the misrepresentation, the plaintiff would not have acted as he did." *Id.* (internal quotations omitted). In addition, where the alleged misrepresentation is an *omission,* a plaintiff must also show she "would have been aware of it" had the omitted fact been disclosed. *Buckland v. Threshold Enters., Ltd.,* 155 Cal.App.4th 798, 66 Cal.Rptr.3d 543, 549 (2007).

■■■ In general, both of these elements—that the plaintiffs would have been aware of the disclosure and that they would have decided not to buy the garments—are proven with reference to a "reasonable consumer" standard. *See In re Apple & AT & TM Antitrust Litig.,* 596 F.Supp.2d 1288, 1310–11 (N.D.Cal.2008) ("Materiality depends on a plaintiff showing that had the omitted information been disclosed, a reasonable consumer would have been aware of it and behaved differently." (internal quotations omitted)); *Falk v. Gen. Motors Corp.,* 496 F.Supp.2d 1088, 1095 (N.D.Cal.2007) ("Materiality, for CLRA claims, is judged by the effect on a 'reasonable consumer.'" (citing *Consumer Advocates v. Echostar Satellite Corp.,* 113 Cal.App.4th 1351, 8 Cal.Rptr.3d 22 (2003))). However, "if the issue of materiality or reliance is a matter that would vary from consumer to consumer, the issue is not subject to common proof, and the action is properly not certified as a class action." *In re Vioxx Class Cases,* 180 Cal.App.4th 116, 103 Cal. Rptr.3d 83, 95 (2009). Thus, for example, the California Court of Appeal found that individual issues predominated proposed CLRA class claims relating to a failure to disclose risks of Vioxx because consumers would differ in what they considered material. *Id.* at 98–99. There, the evidence showed that Vioxx increased the risk of death for only some patients, that some patients would take the drug even knowing about the risks, that some physicians would not have paid attention to statements by the drug manufacturer, and that many factors informed doctors' decisions to prescribe the drug. *Id.* Similarly, in *Caro v. Procter & Gamble Co.,* the California Court of Appeal explained that materiality could not be presumed on a class-wide basis where class members would differ in whether orange juice's "fresh" and "no additives" labels would lead them to believe the juice was premium, where the carton also said "from concentrate." *Caro v. Procter & Gamble Co.,* 18 Cal.App.4th 644, 22 Cal.Rptr.2d 419, 433 (1993).

Here, Defendants have put forth persuasive evidence that materiality and reliance would vary from consumer to consumer, such that the reasonable consumer standard cannot be applied. First, Defendants cite to evidence that even the named plaintiffs would not have been aware of disclosures had Carter's made them. For example, Nancy Muir testified that she never researched children's clothes online before buying them. (Declaration of Eric Kizirian, Ex. 1 [Deposition of Nancy Muir] at 20:3–25.) Likewise, Defendants offered expert testimony suggesting that consumers would not likely notice warnings posted in stores or on clothes themselves prior to purchase. (Kizirian Decl., Ex. 23 [Report of Dr. Christine Wood].) Because this evidence establishes that awareness of a disclosure would almost certainly vary from consumer to consumer, it shows that the element of reliance cannot be established by the reasonable consumer standard.

Second, Defendants have also put forth evidence that consumers' behavior would vary as to whether they would buy the garments if they saw the disclosure. Defendants point to expert testimony that a consumer's response to a warning will vary

based on many factors including, but not limited to, "the perceived likelihood of severe or moderate injury, whether the warning provides information that is substantially new, whether the information conflicts with his/her previous experience." (Kizirian Decl., Ex. 23 [Report of Dr. Christine Woods] ¶ 28.) Thus, the expert concluded, "[h]ad a warning been provided by Carter's and had it been noticed and read, consumers would not be expected to respond uniformly to the message." (*Id.*)

In light of this persuasive evidence that materiality and reliance would vary from consumer to consumer, the Court concludes that those elements are not subject to common proof under the reasonable consumer standard and that individual issues predominate with respect to the CLRA claims.

### 2. Claims under the "Unfair" Prong of the UCL

■ Although Plaintiffs assert a claim under the "unfair" prong of the UCL in their operative complaint (FAC ¶ 245), they do not mention it in their motion for class certification. The Court addresses it nonetheless.

■ An act or practice is "unfair" under the UCL "if the consumer injury is substantial, is not outweighed by any countervailing benefits to consumers or to competition, and is not an injury the consumers themselves could reasonably have avoided." *Daugherty v. Am. Honda Motor Co., Inc.*, 144 Cal. App.4th 824, 51 Cal.Rptr.3d 118, 129 (2006). These elements are susceptible to class-wide proof, and Defendants do not argue otherwise. Although different consumers experienced different injuries, the Court can consider the aggregate or average injury. Countervailing benefit is plainly a generalized inquiry, and Defendants make no argument that any consumer could have reasonably avoided the injury alleged here.

This, however, means only that Defendants' *liability* is subject to common proof. Whether individual class members are entitled to recover on the basis of this liability is not. As discussed above, unnamed class members are not permitted to bring a claim in federal court where they cannot establish Article III standing. Thus, to recover, plain-tiffs must show that unnamed class members suffered some injury in fact that gives them standing to bring a UCL claim. Under their theory, this would require a showing of actual reliance, i.e. that if the chemical information had been disclosed, absent class members would have been aware of it and not bought the garments. For the reasons explained in the previous section, such reliance is not susceptible to class-wide proof.

### 3. FAL Claims

■ To make out an FAL claim, a plaintiff must show that a company, with intent to dispose of property, disseminated an untrue or misleading statement about that property, which the company knew or should have known to be untrue or misleading. Cal. Bus. & Prof.Code § 17500. These elements all focus on the defendants' conduct and are accordingly susceptible to common proof.

■ Again, however, this means only that Defendants' *liability* is subject to common proof. As with the UCL claim, whether class members are entitled to recover on the basis of this liability is not susceptible to proof on a class-wide basis. To be sure, the FAL allows recovery without proof of actual reliance. *See Sevidal v. Target Corp.*, 189 Cal.App.4th 905, 117 Cal.Rptr.3d 66, 81–82 (2010). However, as discussed above, unnamed class members are not permitted to bring a claim in federal court where they cannot establish Article III standing. Thus, even though the FAL itself does not require a showing of reliance, plaintiffs must show that unnamed class members suffered some injury in fact that gives them standing to bring an FAL claim. As explained in the previous section, establishing such an injury in fact is not susceptible to class-wide proof.

### 4. Claims for Fraudulent Concealment and under UCL's 23 "Fraud" Prong

■ To make out a fraudulent concealment claim, a plaintiff must show that the defendant intentionally suppressed a material fact that it had a duty to disclose with the intent to defraud the plaintiff, that the plaintiff was unaware of the fact and would not have acted as she did had she been aware of

it, and that the plaintiff was injured as a result. *Blickman Turkus, LP v. MF Downtown Sunnyvale, LLC,* 162 Cal.App.4th 858, 76 Cal.Rptr.3d 325, 332 (2008). To make out a claim under the "fraudulent" prong of the UCL, Plaintiffs need only prove that "members of the public are likely to be deceived." *Wang v. Massey Chevrolet,* 97 Cal.App.4th 856, 118 Cal.Rptr.2d 770, 781 (2002).

The fraudulent concealment claim is not susceptible to class-wide proof because, for the reasons explained above, whether class members would have been aware of a disclosure and acted differently are individualized inquiries. Moreover, even though the UCL's "fraudulent" prong does not require proof of reliance, federal standing jurisprudence requires some showing of injury before an unnamed plaintiff can recover. Thus, that claim is also not susceptible to class-wide proof.

### 5. Warranty Claims

■ Plaintiffs also pursue warranty claims against Carter's on behalf of the California sub-class of consumers who bought garments directly from Carter's. They assert a claim for breach of the implied warranty of merchantability and further claim that that breach amounted to a violation of the Magnuson–Moss Act and the UCL's unlawful prong. Under California law, certain sales of goods give rise to a warranty that the goods will be "fit for the ordinary purposes for which such goods are used" and would "[p]ass without objection in the trade." Cal. Comm.Code § 2314. To make out a claim, a plaintiff must show not only that the good did not meet that standard, but also that the plaintiff was harmed, and that the failure of the product to have the expected quality was a substantial factor in causing that harm. *See Andrade,* 2004 WL 2480708, at *23 (citing CACI No. 1231). The presence of a defect, without more, does not establish harm. *See Hicks,* 107 Cal.Rptr.2d at 768. Here, Plaintiffs cannot establish harm on a class-wide basis.

In sum, common questions predominate as to all the claims that Plaintiffs press in this suit. The proposed classes accordingly do not satisfy Rule 23(b)(3)'s requirement that common issues predominate.

#### b. *Superiority*

■ The Court also concludes that a class action would not be a superior method of adjudicating the claims presented here. In determining whether a class action is superior, the Court looks to factors including:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Fed.R.Civ.P. 23(b)(3).

The Court is persuaded that a class action is not superior because Carter's is already offering the very relief that Plaintiffs seek: it allows consumers to obtain refunds for the garments, even without a receipt, and reimburses consumers for out-of-pocket medical costs for treating skin irritation resulting from the tagless labels. As noted, Carter's will pay up to $250 for medical expenses without requiring any documentation. Plaintiffs object that Carter's refund policy does not actually promise relief for the vast majority of consumers who are unaware of the policy. (Reply at 30–31.) They contend that, by concealing the true facts from the public, Carter's has minimized the availability of refunds, and that a class action with proper notice would provide relief to more people.

Although there is no controlling case law, other district court cases 25 provide guidance. Often, the extent of public awareness of the refund programs played an important role in determining whether refund programs rendered class actions inferior for purposes of Rule 23(b)(3). In *In re Phenylpropanolamine (PPA) Products Liability Litigation,* a district court reasoned that "[i]t makes little sense to certify a class where a class mechanism is unnecessary to afford the class members redress." *In re Phenylpropanolamine (PPA) Prods. Liab. Litig.,* 214

F.R.D. 614, 622 (W.D.Wash.2003). There, the defendant offered refunds and product replacement to consumers who had purchased drugs containing PPA who could provide proof of purchase. *Id.* The court brushed aside the plaintiffs' concern that these programs only offered redress to consumers who actively sought it out or who happened to learn about the refund program on a website. *Id.* The court concluded that "a significant number of people somehow heard about these programs," where defendants had given refunds to over 47,000 consumers. *Id.* Moreover, the court noted that the "possible availability of refunds likely occurred to a number of people" after the FDA widely publicized the withdrawal of drugs containing PPA. *Id.*

Following this case, a district court in *In re ConAgra Peanut Butter Products Liability Litigation* concluded that a class action was not superior where the defendant already had a voluntary program to refund consumers for possibly contaminated peanut butter, "in some instances without a proof of purchase or consumption." *In re ConAgra Peanut Butter Prods. Liab. Litig.*, 251 F.R.D. 689, 700–01 (N.D.Ga.2008). There, the court emphasized that "news of [the] refund program ha[d] been widely disseminated and received." *Id.* at 700. The defendant received over 1.3 million calls in the first week after it announced its recall program. *Id.* at 701. Thus, contrary to those plaintiffs' objections, the refund program was not "minimal" or "illusory." *Id.*

The Carter's notice to consumers does not appear to be as extensive as the notice of refunds in the *ConAgra Peanut Butter* or *PPA Products Liability* cases. Carter's CEO testified that the refund policy was communicated on the company's website, in his interview with the website ZRecommends, in the CPSC statement, and "by our consumer affairs group when they interacted with people." (Docket No. 200, Declaration of Brian R. Tinkham, Ex. B [Casey Depo.] at 149:13–150:4.) The CPSC statement does not reference the refund policy, however. (Am. Simerlein Decl., Ex. 54, Ex. A.) In addition, none of these statements mentions the availability of reimbursement for medical expenses, and only ZRecommends mentions the availability of refunds without a receipt.

(*See id.;* FAC, Ex. F [ZRecommends Article].) In addition, unlike in the peanut butter and PPA cases, no well-publicized recall has alerted consumers to the possibility of refunds. Indeed, there has been no recall, and the only government-agency announcement did not reference the refund policy. Although 9,828 consumers had obtained refunds for 158,128 garments as of October 1, 2010 (Cleveland Decl. ¶ 8), this represents only a little over 0.14 percent of garments.

The Court, however, concludes that the relatively small number of returns most likely indicates that the majority of consumers are satisfied with the garments they bought. Thus, as in the *PPA Products Liability* case, "[t]he fact that consumers have not sought refunds in large numbers may well demonstrate that certification of the proposed class would merely serve to create lawsuits where none previously existed." *In re PPA Prods. Liab. Litig.*, 214 F.R.D. at 622. Because Carter's already offers the very remedy sought in this suit, the Court concludes that a class action is not "superior" within the meaning of Federal Rule of Civil Procedure 23(b)(3).

### IV. CONCLUSION

For the reasons set forth above, the Court **DENIES** Plaintiffs' motion for class certification.

**IT IS SO ORDERED.**